IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANNA NIETO, BETTY DELOSSANTOS,
PATRICK SANCHEZ, SALLY NETSCH,
PHYLLIS DEBAUN, and MARY GONZALES,

     Plaintiffs,

vs.                               No. CIV 96-1225 MV/JHG

QUDRAT KAPOOR,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on First Amended Motion to Intervene for Sole Purpose of Participating in Preparation of Jury Instructions, filed June 10, 1998 **[Doc. No. 191]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Nieto, filed August 17, 1998 **[Doc. No. 197]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Gonzales, filed August 17, 1998 **[Doc. No. 199]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff DeBaun, filed August 17, 1998 **[Doc. No. 201]** Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Netsch, filed August 17, 1998 **[Doc. No. 203]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Sanchez, filed September 28, 1998 **[Doc. No. 246]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff DeLosSantos, filed September 28, 1998 **[Doc. No. 250]**,[1] and Defendant Kapoor's Motion to Strike "Plaintiff [sic]

---

[1] The two motions for summary judgment Defendants filed on September 28 were each served on August 25, some six weeks past the motion serving deadline the magistrate judge has imposed in this case. Although the

Response to Dr. Kapoor's Motion for Summary Judgment Regarding Claims made by Phyllis DeBaun", filed October 5, 1998 **[Doc. No. 254]**. The Court, having considered the pleadings, relevant law, and being otherwise fully informed, finds that the motion to intervene is not well taken and will be **denied**, the motion to strike is not well taken and will be **denied**, and that the motions for summary judgment are not well taken and will be **denied in part**. The Court will also *sua sponte* transfer case number CIV 96-1623 JC/DJS to the judge assigned to the present action.

## Background

Plaintiffs originally brought a complaint in state court against Defendant Kapoor, a physician staffing the radiation oncology department at Eastern New Mexico Medical Center ("ENMMC") and various hospital defendants. In an amended complaint filed after Defendants removed the action to this Court, Plaintiffs, all former employees of the department, claim that for several years beginning in 1993 Defendant Kapoor subjected them to a hostile work environment. Specifically, Plaintiffs aver that Dr. Kapoor routinely made disparaging and offensive remarks pertaining to minorities and women, repeatedly used offensive inappropriate language regarding race and gender in public in the department, made physical contact of various degrees with Plaintiffs, and interfered with their employment duties. In short, Plaintiffs allege being subjected by Dr. Kapoor to substantial verbal, emotional, and physical abuse. Dr. Kapoor denies the allegations.

Because the ENMMC Defendants no longer are a part of this action, the Court lists the charges in the amended complaint that are germane to claims brought against Dr. Kapoor. In Count

---

parties dispute whether consent among themselves existed to serve these motions, even assuming consent, the motions were served without the Court's leave. Whatever the extent of an alleged agreement between the parties, it cannot change the deadline the Court has imposed. This deadline exists in part to help allocate scarce judicial resources. The parties are strongly cautioned, in light of the magistrate's recent order permitting the taking of an additional thirteen depositions and allowing Defendants to conclude discovery, that the Court will summarily strike any dispositive motions filed without leave indicating just cause.

II Plaintiffs have brought a § 1983 claim, focusing on Dr. Kapoor's alleged deprivation of their due process and equal protection rights. Plaintiffs also allege retaliation for protected First Amendment activity. Count III alleges that Dr. Kapoor conspired to deprive Plaintiffs of those rights, in violation of 42 U.S.C. § 1985. Counts IV through VII bring supplemental state law claims, setting forth causes of action sounding in negligence, intentional infliction of emotional distress, prima facie tort and breach of contract. The Court has previously dismissed the negligence and prima facie tort claims, and Plaintiffs now acknowledge withdrawing their contract claims. Accordingly, all that remains before the Court are allegations of § 1983 and § 1985 violations and claims for intentional infliction of emotional distress.

In the six pending motions for summary judgment, Dr. Kapoor takes an identical approach. Dr. Kapoor first claims that the emotional distress claims do not show a sufficient factual basis to succeed as a matter of law. Then alleging being shielded by qualified immunity,[2] Dr. Kapoor goes on to argue that as a matter of law, Plaintiffs' First Amendment retaliation claims fail for lack of proof. Finally, Dr. Kapoor urges the Court to dismiss the § 1985 conspiracy count, claiming an absence of sufficient factual detail necessary to sustain a claim for relief.

Dr. Kapoor's motion to strike has its roots in Plaintiffs' filing, without leave of the Court, an excess number of exhibit pages. Where Plaintiffs contend the filing arose out of concerns for efficiency, Dr. Kapoor focuses on its procedural deficiencies.

Dr. Kapoor's medical malpractice liability carrier has filed the motion to intervene, and has also filed a declaratory action in this Court, number CIV 96-1623 JC/DJS. Essentially looking to defend its interests with respect to whether Dr. Kapoor was acting outside the scope of his policy's

---

[2] The Court has held that Dr. Kapoor is a state actor for purposes of this litigation. *See Nieto v. Kapoor, et al.*, No. CIV 96-1225 MV/JHG, slip. op. at 5-6 (D. N.M. Sept. 18, 1998).

protection, Medical Protective Company ("Medical Protective") aims to participate in the jury instruction process.

## Discussion

I. The motions for summary judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this standard, the moving party initially carries the burden of pointing out to the trial court that there is an absence of evidence to support the nonmoving party's case, although the moving party "need not affirmatively negate the nonmovant's claim in order to obtain summary judgment." *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 1165 (1998), *citing Celotex v. Catrett*, 477 U.S. 317, 322-23, 325 (1986). The Court examines the factual record and all reasonable inferences therefrom in the light most favorable to the nonmoving party, *Allen*, 119 F.3d at 839-40, and materiality of facts in dispute, if any, is dependent upon the substantive law, *id.* at 839, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant has met this burden, Rule 56 requires the nonmovant to go beyond the pleadings and show, through affidavits, depositions, answers to interrogatories, and the like that there is a genuine issue for trial. *Allen*, 119 F.3d at 841, *citing Celotex*, 477 U.S. at 324; *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1988). Conclusory allegations are not enough, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-72 (10th Cir. 1998), but summary judgment "is warranted only if the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." *David v. City and County*

*of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996).

A.  Intentional infliction of emotional distress

The tort of intentional infliction of emotional distress first rose to prominence in New Mexico in *Dominguez v. Stone*, 638 P.2d 423 (N.M. Ct. App. 1981).  Quoting with approval from the Restatement (Second) of Torts, the *Dominguez* court stated that to be actionable, conduct must go beyond acting with an intent which may be tortious or even criminal, and must be "so outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*, 638 P.2d at 426; *see also Jaynes v. Strong-Thorne Mortuary, Inc.*, 1998-NMSC-004 at ¶¶ 12-14, 954 P.2d 45, 50 (N.M. 1997); UJI 13-1628 NMRA 1997.  More recently, the court of appeals noted

> that, as part of the price of personal liberty, a free and democratic society must tolerate certain offensive conduct as well as some obnoxious or morally deviant behavior.  Accordingly, the mere fact that an actor knows that his conduct is insulting, or will deeply hurt another's feelings is insufficient to establish liability.

*Padwa v. Hadley*, 1999-NMCA-067 at ¶ 11 (N.M. Ct. App. 1999).

Courts initially must determine "whether the defendant's conduct may be regarded as so extreme and outrageous as to permit recovery."  *Salazar v. Furr's, Inc.*, 629 F. Supp. 1403, 1410 (D. N.M. 1986); *Padwa*, 1999-NMCA-067 at ¶ 9.  Where reasonable minds may differ a jury must decide whether the conduct at issue meets the requirements of the tort.  *Id.*

Applying these standards to the facts as alleged and supported by deposition testimony, the Court concludes that the jury in this case should properly decide whether the totality of Dr. Kapoor's conduct meets the requirements of the tort.  In addition to allegations of strikingly insensitive conduct with respect to Plaintiffs' ethnicity, Plaintiffs have presented an overabundance of testimony so far

to support their claims that Dr. Kapoor treated women employees poorly and was regularly abusive. From this evidence reasonable minds could conclude that Dr. Kapoor's conduct rises to the level of being outrageous. The Court, therefore, will allow the jury to decide whether the alleged conduct at issue is sufficiently severe to go "beyond the bounds of common decency and [be] atrocious and intolerable to the ordinary person." UJI 13-1628 NMRA 1991.

For all Plaintiffs but Ms. Netsch, one of the principal claims against Dr. Kapoor is that, on repeated occasions, he denigrated their ethnicity and national origin, principally by referring to them both to their face and in front of patients and staff as "stupid and lazy Mexicans" and stating that the schedule at the oncology center could not be maintained because of "siestas" and "mañana, mañana, mañana." The record is replete with allegations, supported by deposition testimony and by a memorandum from the director at the ENMMC Cancer Treatment Center, of Dr. Kapoor's repeated use of those terms. In addition, more than one Plaintiff testified hearing Dr. Kapoor discuss acquiring some land and hiring workers from Mexico at low wages so that he could become rich. Depositions of Anna Nieto at 40-41; Betty DeLosSantos at 68-69; Patrick Sanchez at 56-57; DeBaun Deposition at 34. When ENMMC employee Frank Sanchez had not performed a task to Dr. Kapoor's satisfaction, Dr. Kapoor allegedly told Plaintiff Patrick Sanchez "when is that stupid Mexican going to learn how to do simulations? Why doesn't he go back where he came from?" Sanchez Deposition at 77. Patrick Sanchez also states that Dr. Kapoor, in complaining about a fellow doctor in Roswell, called him a stupid Mexican who performed inappropriate surgeries. *Id.* at 93-94. Mr. Sanchez stated that Dr. Kapoor spent more time with Anglo than with Hispanic patients. *Id.* at 59, 85. To Plaintiff DeLosSantos, Dr. Kapoor allegedly stated, in treating an African-American patient, that "[t]hey are like some of those Spanish people that don't clean up." DeLosSantos Deposition at 74.

Betty DeLosSantos states that Dr. Kapoor told her not to associate with an Anglo technician, since she was not her kind. *Id.* at 123. Ms. DeLosSantos also alleges that Dr. Kapoor, commenting on her daughter's height, stated that she was abnormal and would always be a "short little Mexican." *Id.* at 72. In front of Plaintiff Gonzales Dr. Kapoor commented to an Anglo patient whose daughter married a Hispanic man that she had degraded herself by marrying down. Gonzales Deposition at 31-32. Nor did Dr. Kapoor spare Ms. Netsch's ethnic origins. Plaintiff Netsch alleges that Dr. Kapoor, in reminiscing about some time he had spent in Scotland, told her that "Scottish people had no work ethic because they were all standing at the gate before closing time waiting to go home." Netsch Deposition at 64-65. There are no shortage of supported allegations, then, that Dr. Kapoor freely distributed ethnic slurs to all the Plaintiffs.

This slurring on ethnicity and national origin is precisely what created the circumstances through which the New Mexico Court of Appeals gave effect to the tort of intentional infliction of emotional distress. The plaintiff in *Dominguez* was a Mexican national who occupied a position funded by United States tax dollars. *Dominguez*, 638 P.2d at 424. The defendant questioned the expenditure of those dollars to fund a position for someone of the plaintiffs' alienage and ethnicity. *Id.* Discoursing on prejudice, stereotypes, and the disparagement of minorities, *id.* at 425, the *Dominguez* court found that an issue of fact existed with respect to the alleged tort. *Id.* at 427. This Court concludes likewise in this case.

Contributing to creating a jury question for this cause of action are Plaintiffs' allegations of pervasive conduct that is belittling to women. A significant part of those allegations focuses on abusive comments Plaintiffs allege Dr. Kapoor routinely uttered. For example, Plaintiff Netsch alleges that Dr. Kapoor made

> statements that the only reason women get married was to get the men's money; that the only thing women are good for is, number one, to be your lover when they are young and then to provide you with children and then to take care of you in old age... He often thought women were stupid. He called us whiney and oversensitive, that we told stories [sic].

Netsch Deposition at 22; *see also* DeBaun Deposition at 98-100.

Phyllis DeBaun stated in her deposition having heard Dr. Kapoor tell "patients that women served a purpose for men; that that was their job, that was their duty; that [she] was paid enough to do anything he told [her] to do, quote, unquote." *Id.* at 35. Sally Netsch also testified that Dr. Kapoor told her that she was abandoning her babies by working full time, Netsch Deposition at 65, 66, and commented to patients he thought it was appalling that Netsch was a working mother, also saying that women should be at home with their children. *Id.* at 67-68. Anna Nieto testified that Dr. Kapoor once inquired into her romantic life. Nieto Deposition at 21. Plaintiff DeLosSantos stated that Dr. Kapoor told her she should quit her job and go work in a nursing home, precipitating a visit to the emergency room when she experienced stress and chest pains. DeLosSantos Deposition at 101-05. Plaintiff Gonzales complained of a conversation that Dr. Kapoor had with a male patient in her presence, where Dr. Kapoor stated that "women were nothing but penis envy." Gonzales Deposition at 22-23. Ms. Netsch asserted that Dr. Kapoor would discuss his sexual activities with male patients in her presence. Netsch Deposition at 86-87. According to Ms. Gonzales, Dr. Kapoor also would disparage her in front of patients, one time saying: "look at her, she thinks she's a model," and telling her to stand like a nurse. Gonzales Deposition at 21.

Dr. Kapoor argues, citing *Obendorfer v. Gitano Group, Inc.*, 838 F. Supp. 950 (D. N.J. 1993), that comments alone are not, as a matter of law, sufficient to support an intentional infliction of emotional distress action. *Obendorfer* does stand for this proposition, *id.* at 955, yet to stop there

is to incompletely read this case. *Obendorfer* expressly recognizes that insults coupled with other conduct could be sufficient to support the tort. *Id.* Indeed, "in some situations degrading comments coupled with continued discriminatory and harassing conduct might be sufficiently outrageous to support a claim of intentional infliction of emotional distress." *Id., citing Porta v. Rollins Environmental Services (NJ), Inc.*, 654 F. Supp. 1275 (D. N.J. 1987).

In addition to the comments already recounted, Plaintiffs have testified in their depositions to conduct that reaches beyond mere words or insults. Anna Nieto stated that Dr. Kapoor once touched her lower back in a massaging fashion. Nieto Deposition at 22. Plaintiff DeBaun, with 14 years of experience in radiation therapy, testified that Dr. Kapoor would repeatedly go to men with lesser experience rather than discuss patients with her. DeBaun Deposition at 26-32, 112. Plaintiff Nieto also stated that Dr. Kapoor refused to let her perform her job, and insisted that a man be called in instead. Nieto Deposition at 49-59. All Plaintiffs testified to Dr. Kapoor's repeated physical contact with female staff, and Mr. Sanchez described one instance where Mr. Kapoor was physical with him. For example, Betty DeLosSantos stated that Dr. Kapoor would grab her and push her into a hallway or examining room when needing to see a patient. DeLosSantos Deposition at 81-82. Patrick Sanchez on more than one occasion saw Dr. Kapoor grab Plaintiffs DeBaun, Netsch, and DeLosSantos by the arm and move them down the hall. Sanchez Deposition at 108. Mr. Sanchez also testified that on one occasion Dr. Kapoor, displeased at his less than immediate response to a request to perform a certain task, "came roaring into [his] office, pulled [his] chair around, and told [him he] was going to take that contour right now." Sanchez Deposition at 100-101. Sally Netsch and Phyllis DeBaun also testified to being grabbed and pushed by Dr. Kapoor. Netsch Deposition at 24; DeBaun Deposition at 126. Dr. Kapoor threw patient charts and other objects at Plaintiffs.

Gonzales Deposition at 24, 27-28, 42; DeBaun Deposition at 40; Netsch Deposition at 24; DeLosSantos Deposition at 83-85. Sally Netsch testified that Dr. Kapoor would not grab or push male staff members, while he did it to women. Netsch Deposition at 29.[3] Thus, Dr. Kapoor's contention that mere words are not actionable under the tort of intentional infliction of emotional distress stops well short of accounting for the evidence now before the Court.

In sum, the Court finds that reasonable minds could differ on whether the described conduct is actionable. Dr. Kapoor's alleged repeated racial and gender-based slurs and derogatory comments, combined with his many physical contacts with the Plaintiffs, all are more than sufficient to create a jury question for this cause of action.

B.  Qualified immunity: the Equal Protection claims

Although Plaintiffs at one time were asserting procedural due process violations, *see* Plaintiffs' Response to ENMMC Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claims under 42 U.S.C. Section 1983 (First and Fourteenth Amendment Claims; Qualified Immunity), Plaintiffs implicitly admit that with the dismissal of their contract claims all that remains of their constitutional claims are alleged violations of the Fourteenth Amendment's Equal Protection Clause and of the First Amendment's free speech guarantees. *See, e.g.*, Plaintiffs' Response to Dr. Kapoor's Motion for Summary Judgment Regarding Claims Made by Phyllis DeBaun at 2-3. Against these claims Dr. Kapoor has asserted qualified immunity, arguing that his conduct toward each of the Plaintiffs has not violated clearly established law.

The doctrine of qualified immunity shields state actors "from liability for civil damages insofar

---

[3] Patrick Sanchez, however, testified that Dr. Kapoor "would put his arm around me and make me run back towards wherever he wanted me to go at the time forcefully." Sanchez Deposition at 100. There is conflicting evidence, therefore, on the extent of Dr. Kapoor's physical contact with ENMMC staff.

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Woodward v. City of Worland*, 977 F.2d 1392, 1396 (10th Cir. 1992), *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a defendant adequately raises the defense, "the plaintiff must show that the law was clearly established when the alleged violation occurred and come forward with facts or allegations sufficient to show that the official violated clearly established law." *Woodward*, 977 F.2d at 1396. Generally, "for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). In assessing a qualified immunity defense, a court may not stop at generalized principles of law, but must instead consider factual settings sufficiently analogous to the case at bar. *Id.* at 1497. However, a plaintiff need not cite case law precisely on point to defeat the qualified immunity defense. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Chapman v. Nichols*, 989 F.2d 393, 397 (10th Cir. 1993). *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997), has cautioned that courts

> would be placing an impracticable burden on plaintiffs if [they] required them to cite a factually identical case before determining they showed the law was 'clearly established' and cleared the qualified immunity hurdle.

*Clanton*, 129 F.3d at 1156-57, *quoting Lawmaster v. Ward*, 125 F.3d 1341, 1351 (10th Cir. 1997). Both *Clanton* and *Lawmaster* instead show that there must be some, but not precise factual correspondence from other case law when deciding a qualified immunity claim. *Clanton*, 129 F.3d at 1157.

Under their overarching complaint of hostile work environment,[4] Plaintiffs essentially have brought two equal protection claims: one for gender discrimination and one for national origin discrimination. Dr. Kapoor does not argue, as he can not, that discrimination based on either gender or national origin is not actionable. Rather, Dr. Kapoor focuses on two arguments in claiming that he enjoys immunity. First, Dr. Kapoor claims that the facts as alleged do not show sufficient pervasiveness to meet the requirements of hostile environment law. Second, Dr. Kapoor asserts that certain alleged conduct, for example grabbing a nurse to hurry her down the hall or throwing objects, has not been shown to be a violation of clearly established law.

Dr. Kapoor's parsing of the individual allegations Plaintiffs have brought is ineffective, for the Supreme Court has given clear guidance that

> whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993); *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998).

Thus, this Court may not merely decide whether grabbing a nurse to hurry her down the hall, or throwing charts at the staff, or discussing patient treatment with men rather than women nurses, are by themselves incidents of conduct on which the law has not heretofore given clear guidance. The Court must consider the allegations as a whole.

---

[4] Plaintiffs may assert a hostile environment claim while seeking redress for violations of the Equal Protection Clause under § 1983. *See Jemmot v. Coughlin*, 85 F.3d 61, 67 (2nd. Cir. 1996). The "elements of the substantive cause of action are the same under both statutes." *Id.; see also Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).

Looking to the totality of the allegations in this case, it is clear that Dr. Kapoor is not entitled to qualified immunity. Plaintiffs' factual averments recited above, supported by deposition testimony, allege a patently offensive pattern of both direct and indirect abuse directed at Hispanics and women that more than meets the standard of pervasiveness the Tenth Circuit has established for hostile environment claims. *See Bolden v. PRC, Inc.*, 48 F.3d 545 (10th Cir. 1994). Such conduct, if true as alleged, was sufficiently severe to create a hostile or abusive work environment under the *Harris* factors and Tenth Circuit standards.

Other evidence buttresses this conclusion. Certain Plaintiffs allege that Dr. Kapoor treated female patients differently than his male patients. Discriminatory treatment of Hispanic or women patients can contribute to a hostile work environment for Hispanic or women employees. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65-66 (1986), *citing Rogers v. E.E.O.C.*, 454 F.2d 234 (5th Cir. 1971); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982). Ms. DeBaun complains that Dr. Kapoor would let male staff place vaginal markers in female patients and not allow the radiation staff to bring in a female nurse. DeBaun Deposition at 27. Patrick Sanchez testified that Dr. Kapoor performed a full pelvic exam on a female patient, asking a man to hold one of the patient's legs. Sanchez Deposition at 59-62.[5] Mr. Sanchez also testified that when examining certain

---

[5] Mr. Sanchez's complete testimony on this point more fully explains this conduct:

[Mr. Sanchez] There was a patient – a young female patient that we were treating for pelvic carcinoma, she was approximately in her thirties.

Dr. Kapoor asked me to come in and take a look at her setup with him after treatment one day. So I came into the room with him, the patient was lying on the table, and she was draped in the proper, respectful manner that you would drape somebody that was being treated in the pelvic area.

There was a tech by the name of Evan, there was Richard Garcia, myself. The very first thing he did was he grabbed the sheet that was covering this lady's pelvic area and just pulled it and threw it away to the side. This exposed her genital area. That was exposed with myself, Richard and Evan in the room.

I had never seen that done before by a physician –

patients, Dr. Kapoor did so without any regard for their pain:

> [Mr. Sanchez]:  We had a patient that had bone metastasis to her ribs, and we'd been treating her for quite awhile, maybe six months to a year.  Finally, you know, it metastasized into the bone, and it was in her ribs, she was in tremendous pain.
>
> Dr. Kapoor, when he examined the area where she was having the pain in the ribs, poked this lady, like this (indicating), so hard that she almost jumped off the table.
> Q.  Okay.
> A.  And that was pretty common when it came to examinations like that type of women or Hispanics [sic], that was a very common process for him.
> Q.  To physically touch the area?
> A.  Physically touch the area in a very strong fashion, without any compassion for the person, without any compassion for the pain that the patient is already suffering sitting on that table.

Sanchez Deposition at 64.

Sally Netsch testified that Dr. Kapoor provided very little modesty to women patients when it came

to physical exams, Netsch Deposition at 34, reprimanded female patients for the businesses they ran,

*id.* at 35-36, spent more time with male patients than with female patients, *id.* at 64, and devoted

---

Q. Okay
A.  – when they were checking a setup on the pelvic area.
Q.  Was there anyone else in the room besides those three or four people?
A.  Yes, I believe there was another tech by the name of Rita Anderson.
So after we had checked the setup – and for me, it was very difficult to check the setup because I knew this patient, we'd been treating her for about three or four weeks, Evan knew this patient, he'd been treating her for about three or four weeks; Richard knew the patient; and from the time he pulled the sheet off, she turned her head and she was just so embarrassed.
Q.  Okay.
A.  And then– and then me and Evan, we were just looking at each other and we were shocked.
Then he decided to do a full pelvic exam right on the table, right in front of our faces.
So he and Richard – it's a very difficult thing to lie on a table and have a pelvic exam – a female pelvic exam on the table.  He had Richard get him a glove to put on his finger, whatever.  He had Richard hold her leg open on one side and he had Rita hold her leg open on the other side, and he proceeded to do a full vaginal exam right in front of our faces...
So the exam was completed, and me and Evan went back into the room, and Evan had become very close to this patient and the doctor had left, Richard had left, Rita was still there, and the patient was crying, and she was so embarrassed.
Sanchez Deposition at 60-62.

little, if any, attention to Hispanic patients, *id.* at 35, and on one occasion harassed a female patient

so badly that she left crying. *Id.* at 44. Betty DeLosSantos stated that Dr. Kapoor pinched or popped

the nipples of female patients. DeLosSantos Deposition at 144. Ms. DeBaun corroborates Mr.

Sanchez's claims, saying that

> when [Dr. Kapoor] examined female patients, he would bring men
> into the room. On radiated inflamed areas, such as a breast, he would
> yank and ask the patient if that hurt. They'd been receiving treatment
> for three to four weeks, they'd practically come off the table.

DeBaun Deposition at 30.

In sum, as in *Rogers*, the abusive treatment of the hospital's patients could contribute to the creation

of a hostile environment for the hospital's employees.

The Court recognizes a disparity in the amount of abuse some Plaintiffs have alleged with

respect to others. For example, Mary Gonzales had the least complaints regarding Dr. Kapoor's

behavior and did not claim that Dr. Kapoor grabbed her. Yet the Supreme Court has cautioned that

examples of severely harassing conduct "do not mark the boundary of what is actionable." *Harris*,

510 U.S. at 22. Even Ms. Gonzales, who has the fewest claims among Plaintiffs here, has alleged

sufficiently pervasive conduct that alters her conditions of employment to survive a qualified

immunity motion.

Some of the conduct Plaintiffs have described bears comparing to conduct depicted in *Kopp*

*v. Samaritan Health System, Inc.*, 13 F.3d 264 (8th Cir. 1993). There a physician stood accused by

a hospital employee of yelling and throwing his stethoscope at her, calling her a "stupid bitch," and

angrily shaking her for approximately 30 seconds. *Id.* at 266. Other testimony alleged numerous

instances of the doctor's "shouting at, swearing at, throwing objects at, using vulgar names to refer

to, and shoving female employees." *Id.* at 267. Those circumstances in part led the appellate court

to reverse a grant of summary judgment in favor of the hospital in this Title VII action.

Similarly, *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir. 1988), cited for an example of hostile environment by *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1545 (10th Cir. 1995), discusses some of the same behavior with which Plaintiffs here have charged Dr. Kapoor. Contributing to the hostile environment in *Huddleston* were derogatory gender-based comments uttered in front of customers, *Huddleston*, 845 F.2d at 902, a supervisor's yelling at the plaintiff in front of other employees almost daily, *id.* at 903, and that same supervisor's grabbing the plaintiff by the arm and physically moving her a few feet, berating her for her performance. *Id.* at 904. This Court need look no further than *Kopp* and *Huddleston* in its qualified immunity analysis. A reasonable physician would have been on notice at least as early as 1993 that the conduct Plaintiffs have alleged in this action, if proven, could be sufficiently severe or pervasive as to be clearly against the law.

C.  Factual sufficiency of the First Amendment claims

The arguments Dr. Kapoor presents in seeking to have the First Amendment retaliation claims dismissed are all rooted in a claimed failure of proof. For Plaintiffs DeLosSantos, Sanchez, Netsch, and DeBaun, Dr. Kapoor argues that the facts do not reflect a public complaint regarding mistreatment. Dr. Kapoor admits that Ms. Nieto complained, but states that this complaint did not involve allegations of gender or racial discrimination. For Ms. Gonzales, Dr. Kapoor acknowledges a complaint that touches on gender discrimination, but states, as with all Plaintiffs, that there is no evidence before the Court of his having retaliated against any Plaintiff for complaining of discrimination or harassment.

The time is long past when a public employee had to choose between staying employed and

enjoying First Amendment rights. *See Connick v. Myers*, 461 U.S. 138, 143-144 (1983). Moreover, while a public employee's freedom of speech is not unlimited under modern jurisprudence, a public employee does not forfeit the protection of the First Amendment against governmental abridgment of freedom of speech if she decides to express her views privately rather than publicly. *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414 (1979). The Tenth Circuit has implied a broad definition of First Amendment retaliation, rejecting the notion that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected rights are illegal. Actions short of an actual or constructive employment decision can in some circumstances violate the First Amendment." *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1437 n.3 (10th Cir. 1990).

The proof required for a First Amendment retaliation claim is in four parts, with the first two being legal rulings and the other two being factual findings. *Wulf v. City of Wichita*, 883 F.2d 842, 856-57 (10th Cir. 1989); *Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1201-02 (10th Cir. 1998). The questions of law are whether an employee's speech involves a matter of public concern, and if so, whether the employee's interests in commenting on such matters, balanced "against the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *Dill*, 155 F.3d at 1201, *quoting Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), outweigh the interests of the employer. *Dill*, 155 F.3d at 1201. If a court concludes that the employee's interests tip the balance, then a factfinder must consider whether a plaintiff has proven "that the speech was a substantial factor or a motivating factor in the detrimental employment decision." *Dill*, 155 F.2d at 1202, *quoting Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996). If a plaintiff " makes such a showing, the employer may demonstrate that it would have taken the same

action against the employee even in the absence of the protected speech." *Dill*, 155 F.3d at 1202, *citing Gardetto*, 100 F.3d at 811. The first step of an analysis is determining whether the speech at issue can be "fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146; *see also David*, 101 F.3d at 1355. Considering an employee's motive in speaking out, courts must weigh the content, form and context of the speech in light of the whole record before them. *David*, 101 F.3d at 1355.

At the outset the Court looks to the deposition testimony Plaintiffs have put forth to determine whether, as Dr. Kapoor suggests, Plaintiffs failed to complain regarding their work environment. Although the amount of protected speech in which each Plaintiff engaged varies, construing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party the Court finds that each and every Plaintiff has met the standard for showing that their speech involved a matter of public concern.

Dr. Kapoor cannot seriously debate that Plaintiffs' complaints, while employment related, touch on matters of public concern, for "even speech that focuses on internal employment conditions and is made in the context of a personal dispute may be regarded as pertaining to a matter of public concern if it addresses important constitutional rights which society at large has an interest in protecting." *Woodward v. City of Worland*, 977 F.2d 1392, 1404 (10th Cir. 1992 ). In this instance, the gravamen of Plaintiffs allegations is the pervasive atmosphere of gender and ethnic discrimination at the ENMMC Cancer Center, to which Dr. Kapoor subjected them over the course of some three years at ENMMC. "Allegations of sexual harassment have been found to involve matters of public concern," *Wulf*, 883 F.2d at 860, particularly if the allegations touch not solely on the complainant's own employment conditions, but also involve the harassment of other workers. *See David*, 101 F.3d

at 1356-57. Likewise, speech disclosing racially discriminatory employment practices is a "matter of social concern to the community." *Patrick v. Miller*, 953 F.2d 1240, 1247 (10th Cir. 1992); *see also Langley v. Adams County, Colo.*, 987 F.2d 1473, 1479 (10th Cir. 1993).

All Plaintiffs testified that they complained at least to Wayne Stockburger, the director of the ENMMC Cancer Center, concerning Dr. Kapoor's treatment of Hispanics and women. Mr. Patrick Sanchez, perhaps the most vocal of the Plaintiffs, stated that he first complained to Dr. Kapoor, but that Dr. Kapoor would continue with his derogatory comments about Hispanics. Sanchez Deposition at 93. Mr. Sanchez also complained to Mr. Stockburger for over a year, sometimes on a daily basis. *Id.* at 96. Ms. DeBaun reported Dr. Kapoor's conduct to Mr. Stockburger many times. DeBaun Deposition at 30, 32. Ms. Nieto first complained to Ms. Sanchez, who was her supervisor, then gave a letter of grievance to the ENMMC management. Nieto Deposition at 25, 33-34, 45-46. Betty DeLosSantos also testified in her deposition to her multiple complaints to Mr. Stockburger, either by herself or as part of a group of employees, mentioning physical and verbal abuse as well has national origin discrimination. DeLosSantos Deposition at 141-42. Ms. Netsch complained to Mr. Stockburger some ten to twenty times during the nine months that she worked at ENMMC, Netsch Deposition at 33-34, and approached Ms. Susan Craig of ENMMC's personnel department five times. *Id.* at 40. Finally, Mary Gonzales twice complained in writing to Mr. Stockburger about Dr. Kapoor's conduct. Gonzales Deposition at 41. Plaintiffs have sufficiently shown protected speech to clear the first hurdle they face in their retaliation claim.

Dr. Kapoor has made no argument with respect to the disruption to the workplace caused by Plaintiffs' speech. The Court, therefore, next considers whether factual issues exist with respect to retaliation for protected speech.

While the degree of alleged retaliation varies and in some cases the issue of retaliation is a close call, all Plaintiffs have met their burden of showing, through deposition testimony, that triable issues exist which require their determination by a factfinder. Mr. Sanchez testified that following his complaints, Dr. Kapoor began insulting him directly where before his racial slurs, while targeting Hispanics, had not mentioned him by name. On one occasion following a complaint to Mr. Stockburger, Dr. Kapoor allegedly came into Mr. Sanchez's office, very mad, and called Mr. Sanchez a "stupid, lazy Mexican." Sanchez Deposition at 96-98.[6] While her testimony could have been more specific, Ms. DeBaun stated that Dr. Kapoor continually retaliated against her for her complaints to Mr. Stockburger. DeBaun Deposition at 30. Mrs. DeBaun also discusses being intimidated and harassed by Dr. Kapoor during meetings set up to resolve the conflicts he engendered. *Id.* at 32. Plaintiff Nieto clearly alleged retaliation when she testified that following her complaints Dr. Kapoor refused to have her present in her work area. Nieto Deposition at 50-52. Ms. DeLosSantos claimed that Dr. Kapoor threatened to fire her many times, DeLosSantos Deposition at 268, and explained her concern that he could influence the ENMMC administration to do so. *Id.* Ms. Netsch alleges that Dr. Kapoor specifically retaliated by being abusive on occasions when she would complain of his conduct. Netsch Deposition at 77. Lastly, Plaintiff Gonzales testified, as did Ms. Nieto, that Dr. Kapoor retaliated against her by preventing her from being in her work area and doing her job when he was present. Gonzales Deposition at 42-43. In sum, in one degree or another all Plaintiffs have shown a sufficient dispute of material fact on the issue of First Amendment retaliation to warrant the

---

[6] Mr. Sanchez also alleges having heard from Mr. Stockburger that Dr. Kapoor was influential in the elimination of his position and his eventual termination from ENMMC. While this may eventually be shown at trial, it is not the basis of the Court's ruling, for it is axiomatic that on a summary judgment a court must consider only admissible evidence. *Gross*, 53 F.3d at 1541 (10th Cir.1995); *Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir.1995). For this motion Mr. Sanchez has not shown how this evidence would avoid the hearsay bar to admissibility.

denial of summary judgment on that issue.

D.  The conspiracy claims

Dr. Kapoor has alleged in pertinent part that Plaintiffs have not brought forth any facts that would support their theory that Dr. Kapoor conspired with others to deprive them of their civil rights. In response, Plaintiffs point to their responsive brief for another motion, The ENMMC Defendants' Motion to Dismiss or for Partial Summary Judgment on Plaintiffs' Claims under 42 U.S.C. § 1985, filed September 1, 1998 [Doc. No. 224].[7]  In that brief Plaintiffs focus their arguments, addressing Defendants no longer before the Court, on a "conspiracy within the hospital to deprive [them] of their constitutional rights."  Response at 4.  With respect to Dr. Kapoor, however, Plaintiffs have failed to present sufficient facts to overcome a summary judgment motion for their conspiracy claims.

The substantive law of § 1985(3) conspiracy states that "[t]he essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff[s] of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993).  Here, although Plaintiffs have alleged a conspiracy between hospital administrators and Dr. Kapoor, they have not shown evidence of a conspiracy or an act on the part of Dr. Kapoor that would be in furtherance of that conspiracy. The Court has gleaned no factual support for Plaintiffs in the deposition testimony they have submitted for the present motions.  Indeed, the focus of that testimony is the conduct of Dr. Kapoor toward hospital staff and its impact on Plaintiffs.  Likewise, nothing in the depositions and exhibits submitted with the ENMMC motion [Doc. No. 224] can suffice to meet Plaintiffs' burden here.  For example, although Mr. Stockburger testified that administrator Chubb ordered him to "support Dr.

---

[7] As a result of the dismissal of ENMMC Defendants, this motion is now moot.

Kapoor over the staff regardless of cost and to find a way to get Pat Sanchez out of the picture," Stockburger Deposition at 122; Plaintiffs' Exhibit 4, Plaintiffs have provided no documentation of an act Dr. Kapoor has taken or of conspiratorial agreement between Dr. Kapoor and others. Moreover, Plaintiffs' Exhibit 3 is a March 3, 1996 entry in what appears to be Mr. Stockburger's personal diary, where he recounts that "Mr. Chubb acknowledged that he had not met with Dr. Kapoor." In short, Plaintiffs have not presented evidence of an act on the part of Dr. Kapoor to conspire with hospital officials. Due to a lack of evidence which would show a genuine issue as to an essential material fact, then, the Court is compelled to dismiss the conspiracy charge brought pursuant to 42 U.S.C. § 1985.

II.     The motion to strike

        The sole basis for Dr. Kapoor's motion to strike Plaintiffs' response to his motion for summary judgment regarding Ms. DeBaun's claims is that Plaintiffs exceeded, without his concurrence or leave of the Court, the Court's page limitations for exhibits. *See* D.N.M.LR-Civ. 10.5. Plaintiffs respond that faced with duplicative motions by Dr. Kapoor, they consolidated their exhibits in one motion for the sake of convenience and economy. The Court does not condone the taking of liberties with respect to local rules. The appropriate action when faced with a large number of exhibit pages is to follow those rules. Yet, in this instance efficiency is served by denying the motion to strike.

III.    Medical Protective's motion to intervene

        Medical Protective is the professional liability insurer with whom Dr. Kapoor had a policy in

force for the time period spanning Plaintiffs' claims. Medical Protective has filed a declaratory action in this District, seeking to be absolved of any liability to Dr. Kapoor. In that action, Medical Protective brought three arguments. First, it contended that the claims of Plaintiffs here do not fall within the coverage afforded by its policy because they are not based on the rendering of professional services. Second, Medical Protective asserted that the willful torts exclusions, sexual acts exclusions, and punitive damages exclusions of its policy prevent its being obligated to indemnify Dr. Kapoor under the policy. Finally Medical Protective, although it has so far provided a defense to Dr. Kapoor, claimed that it does not owe him a defense obligation.

Dr. Kapoor moved to stay the declaratory action, and Chief Judge Conway, to whom the case was assigned, granted his request on August 11, 1997. *Medical Protective Company v. Nieto, et al.*, No. CIV 96-1623 JC/DJS (D. N.M. Aug. 11, 1997) (order granting stay). As a basis for his ruling, Chief Judge Conway found that the facts alleged in the complaint here against Dr. Kapoor were not sufficiently clear and explicit to allow this Court as a matter of law to determine the scope of the insurance coverage. Following the stay imposed in its declaratory judgment action, Medical Protective moved to intervene here for the sole purpose of submitting jury instructions and special interrogatories to the jury. Medical Protective seeks both as-of-right and permissive intervention.

Plaintiffs are silent on the issue of Medical Protective's intervention.

Intervention under Rule 24 of the Federal Rules of Civil Procedure may, upon timely application, be either as of right or permissive. Fed. R. Civ. P. 24. When as of right, an intervenor must show in relevant part 1) that she has an interest relating to the property or transaction which is the subject of the action, 2) that she is so situated that the disposition of the action may as a practical matter impair or impede her ability to protect that interest, and 3) that existing parties do not

adequately protect that interest. Fed. R. Civ. P. 24(a). For permissive intervention, a party may intervene when her "claim or defense and the main action have a question of law or fact in common," Fed. R. Civ. P. 24(b), with a court considering "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* In this case, Dr. Kapoor does not deny that Medical Protective has acted in a timely manner. The Court focuses, therefore, on the other requirements of the rule.

A.    Intervention as of right

The interest required for as-of-right intervention must be "direct, substantial, and legally protectable." *Coalition of Arizona/New Mexico Counties v. Dept. of Interior*, 100 F.3d 837, 840 (10th Cir. 1996)*; City of Stilwell, Okl. v. Ozarks Rural Elec. Co-op. Corp.*, 79 F.3d 1038, 1042 (10th Cir. 1996). Here Medical Protective contests both liability for indemnification and its duty to defend Dr. Kapoor. It is, however, providing a defense subject to an adjudication that it is not bound to do so. Medical Protective argues that its financial stake in the outcome of the case at bar creates a right which, for purposes of Rule 24, is direct and substantial right. The Court disagrees.

Although the federal law on this issue is somewhat scant, it is sufficiently developed for this Court to make an informed ruling. *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*, 725 F.2d 871 (2nd Cir. 1984), a case frequently cited on this issue, involved a contract and breach of warranty action where the defendant's insurer sought to intervene in the trial "for the limited purpose of submitting written interrogatories to the Court for submission to the jury, to be answered by the jury in the event that it returns a verdict awarding damages to [the] plaintiff." *Id.* at 873. The appellate court, in reviewing the lower's court's decision to deny intervention, reasoned that the insurer did not have an interest in the underlying contract dispute. *Id.* at 875. The court held

24

that the interest the insurer asserted depended on two contingencies: a finding of liability in the contract action, and a finding that the insurer was not liable for indemnification. *Id.* As the *Restor-A-Dent* court took pains to explain, absent a subrogation interest the insurer's interest in the outcome of the litigation was too contingent to be given effect in a motion to intervene.

The *Restor-A-Dent* court candidly noted that the precedents in support of its ruling were "less than overwhelming," *id.* at 876, and that it was resting its holding in part on practical considerations. Notably, the court commented that

> refusal to find a right under Rule 24(a) still [left] open a possibility in an appropriate case of permissive intervention by an insurer under Rule 24(b) for the purpose sought [in the case], while a contrary holding would open the door wider to such intervention regardless of any unfortunate effect on the course of the main action.

*Id.*

Concern for a proper balance between the two parts of Rule 24, then, also influenced the court's ruling.

The underlying action in *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629 (1st Cir. 1989), was litigation to give effect to a settlement agreement addressing environmental liability. *Id.* at 631-32. Primary and excess insurers, who had reserved the right to deny coverage, sought intervention. *Id.* at 632. The court affirmed the denial of intervention, holding that the insurers' interest in minimizing its insured's liability was contingent, precisely because the insurers contested coverage. *Id.* at 638-39. In addition, the court cited the "well-established policy that an insurer who reserves the right to deny coverage cannot control the defense of the lawsuit brought against its insured by an insured party." *Id.* at 639. To permit intervention where coverage is in dispute would allow an insurer to "interfere with and in effect control the defense. Such intervention would unfairly restrict the insured, who

faces the very real risk of an uninsured liability, and grant the insurer a 'double bite at escaping liability.'" *Id., quoting United Services Automobile Ass'n v. Morris*, 741 P.2d 246, 251 (Az. 1987).[8]

Nor can an insurer intervene in order to establish that the policy in effect does not provide coverage. The insurer's interest in adjudicating coverage, like its interest in minimizing its insured's liability, has no bearing on the underlying action, which in *Dingwell* was the apportionment of tort liability. *Dingwell*, 884 F.2d at 640. Aligning itself with the Second Circuit, then, the First Circuit has refused to allow intervention when an insurer seeks to minimize its insured's liability or to adjudicate a coverage issue.

The result may be different where an insurer requests a determination of its duty to defend. In addition to its *Restor-A-Dent* pronouncements, the Second Circuit visited insurer intervention in *American Home Products Corp. v. Liberty Mutual Ins.*, 748 F.2d 760 (2nd Cir. 1984), a case involving an insurer's duty to defend and indemnify a pharmaceutical company in 54 underlying product liability lawsuits. *Id.* at 761. Affirming the trial court's refusal to issue a declaratory judgment addressing those duties, *id.* at 766, the opinion distinguished *Restor-A-Dent* by noting that the issue there did not encompass a duty to defend. Liberty Mutual had argued that the court should have issued a declaratory judgment because it was precluded from intervening in the underlying litigation, citing *Restor-A-Dent*. Differentiating that case, the *Liberty Mutual* panel stated, in two conclusory sentences, that since Liberty's interest was not limited to indemnification liability but included its obligation to defend, it seemed highly unlikely that it would not be allowed to intervene in the underlying litigations. *Id.* at 766. The Second Circuit's position, then, appeared to be that an

---

[8] As another court has put it, where a policy contains a willful conduct exclusion, "a conflict exists between the insurers who would be just as happy to see willful conduct proved, and the insured, who wants any liability to be covered by the policy." *Davila v. Arlasky*, 141 F.R.D. 68, 72 (N.D. Ill. 1991).

insurer meets the interest requirement of Rule 24(a) when it seeks to intervene for the purpose of contesting its duty to defend, as opposed to contesting indemnification.

At least one other federal court has taken a similar approach, although it ultimately denied intervention as of right by finding a lack of impairment. *Davila*, 141 F.R.D. at 71-72. *Davila* involved patent infringement litigation against officers and shareholders of a corporation, where the corporation's insurers sought to intervene as of right. *Id.* at 69. When the defendants tendered their defense, the insurers refused to defend, citing a willful acts exclusion in their policies. *Id.* After surveying the case law on intervention as of right, the court focused on the insurers' interests, looking not just to indemnification but also to the issue of whether a duty to defend existed. *Id.* at 71. The existence of this duty and the perils that an insured could incur in either refusing to defend, reserving rights, or waiving reservations persuaded the court that the insurers had sufficient interest in intervention. *Id.* The court went on to note, however, that where state law requires a trial in a liability action before coverage can be adjudicated, an insurer who seeks to intervene in a dispute over coverage will not be estopped from raising noncoverage defenses in later proceedings. *Id.* at 72. Concluding from this lack of future preclusion that the intervenor thus could show no impairment, the court denied intervention as of right. *Id.* at 72-73.[9]

Another case directly addressing the issue of intervention where an insurer contested both its duty to defend and policy coverage is *Knapp v. Hankins*, 106 F. Supp. 43 (E.D. Ill. 1952), involving dram shop liability. The *Knapp* court, faced with the insurer's request to intervene as of right, reasoned that "it would be unfair to require defendant to defend that case at his own expense if the

---

[9] The Court notes in passing that *Davila*'s reasoning suffers from ambiguity. While deciding that an intervention interest exists when an insurer contests its duty to defend, the *Davila* court proceeds to an impairment analysis on the coverage issue. Those two issues are distinct, though they can be related, and the court transitions from one to the other without explaining the tie that binds them.

policy is valid, even though he might subsequently recover such expenses from the [insurance] Company; it would be equally unfair to require the Company to defend Hankins if the policy is void." *Id.* at 47. Looking to the facts of the tort action indicating significant financial exposure to the insurer, the court concluded that, as in instances where an indemnitor may intervene in an action against a principal debtor, so too should the insurer be able to intervene to contest its duty to defend and provide coverage. *Id.* Taken together, *Liberty Mutual*, *Davila*, and *Knapp* may suggest that the duty to defend interest is sufficiently direct to serve Rule 24(a) purposes.

The holdings or the reasoning of those cases are not persuasive. The interests Medical Protective assert are contingent, as *Restor-A-Dent* and *Dingwell* convincingly reasoned. Against the holdings of those two cases, Medical Protective only has relied on the general intervention principle aimed at "disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Coalition*, 100 F.3d at 841. Medical Protective has not cited a modern appellate case that would allow intervention under the facts before this Court. In addition, while Medical Protective has mentioned its duty to defend as an interest, it has not differentiated it from indemnification issues. As Dr. Kapoor correctly argues, whether Medical Protective owes Dr. Kapoor a duty to defend is not an issue in the present litigation. The duty to defend arises in part from allegations on the face of a complaint or from the known but unpleaded factual basis of a claim. *American General Fire and Casualty Co. v. Progressive Ins. Co.*, 799 P.2d 1113, 1116 (N.M. 1990). Here, while the ultimate facts of this case may have a bearing on indemnification, they are not the principal focus of the duty to defend.

Even if *Liberty Mutual*, *Davila*, and *Knapp* can be read to provide firm support for Medical Protective's arguments, to allow Medical Protective to intervene here would strike at the heart of the

prohibition outlined by the *Dingwell* court. Medical Protective has signaled, through its filing a declaratory action disputing coverage and its duty to defend, that its interests in this case are aligned with Plaintiffs. Moreover, some elements of Plaintiffs' claims, if proved, could favor Medical Protective. Plaintiffs are alleging intentional gender and race based discrimination actionable under § 1983, along with associated tort claims. An element of Plaintiffs' burden for their § 1983 claims is willful conduct. *See Washington v. Davis*, 426 U.S. 229, 238-41 (1976). Prima facie tort also has an intent element. *See* UJI 13-1631 NMRA 1991. Medical Protective has alleged, in its complaint seeking declaratory judgment, the existence of a willful tort or sexual act exclusion in its professional liability policies. A finding of willful conduct could expose Dr. Kapoor both to liability in the primary action and to the loss of coverage. In seeking to intervene for purposes of the preparation of jury instructions, then, Medical Protective is seeking to control Dr. Kapoor's defense in an instance where it contests coverage, thus trying to obtain a double bite at escaping liability, an action which *Dingwell* appropriately recognizes places an unfair burden on an insured. *See Dingwell*, 884 F.2d at 639. The Court denies intervention as of right.

B.      Permissive intervention

Because of the competing interests of Dr. Kapoor and Medical Protective, the Court will deny permissive intervention. Permissive intervention is possible when an applicant's claim or defense and the main action have a question of law or fact in common. Fed. R. Civ. P. 24(b). The very actions of which Plaintiffs complain, if proven, may lead to a determination that Dr. Kapoor has acted outside the scope of the protection afforded by his insurance policy. Thus, at least some common questions of fact exist which would support permissive intervention. In addition, though, under Rule 24(b) a court also must consider whether "the intervention would unduly delay or prejudice the adjudication

of the rights of the original parties."

The defendant's insurer in *Plough, Inc. v. International Flavors and Fragrances, Inc.*, 96 F.R.D. 136 (W.D. Tenn. 1982), obtained limited permissive intervention under procedural facts which closely parallel the ones of the case at bar. The insurer, refusing to defend except on a reservation of rights, brought a separate declaratory judgment action which the court stayed pending a resolution of the underlying litigation taking place in another forum. *Id.* at 136. Then going to the court adjudicating the primary action, the insurer sought both as of right and permissive intervention. Summarily denying as of right intervention, the court allowed permissive intervention "for the very limited purpose of submitting special interrogatories, at pre-trial and trial, to the [c]ourt pursuant to Rule 49(a) and (b)." *Id.* at 137. The court, however, was ambivalent about the insurer's role in the case, reserving judgment on whether the interrogatories would reach the jury, and reserving ruling on whether if they did their answers would be considered advisory only in disputed issues between the insurer and the defendant. *Id.* While allowing permissive intervention, then, the court clearly was uncertain regarding the insurer's participation in the primary litigation.

Despite *Plough*'s illustrating an instance of permissive intervention by an insurer, this Court will deny Medical Protective Rule 24(b) intervention. As the Court already has explained, allowing Medical Protective to intervene where its interests are unquestionably antagonistic to Dr. Kapoor's will prejudice the adjudication of his rights. Not only will he have the burden of presenting a defense to Plaintiffs' accusations, but he will carry the additional burden of having his insurer interfere with his defense. *Dingwell*, 884 F.2d at 639. Because of the conflict between Dr. Kapoor and his insurer, the better course of action, rather than grant permissive intervention, is to allow the stayed declaratory action to resolve that conflict at the conclusion of the present litigation.

IV.     The transfer of case number CIV 96-1623 JC/DJS

New Mexico law recognizes that factual questions surrounding coverage issues and an insurer's duty to defend are appropriately addressed in the primary litigation. *Foundation Reserve Ins. Co. v. Mullenix*, 642 P.2d 604, 606 (N.M 1982); *Lopez v. New Mexico Public Schools Ins. Auth.*, 870 P.2d 745, 748-49 (N.M. 1994). The case at bar is the primary litigation. An adjudication of the respective rights of Dr. Kapoor and Medical Protective will involve the same factual questions raised here. Thus, in the interests of efficiency the Court will transfer case number No. CIV 96-1623 JC/DJS, the declaratory judgment action, to the judge assigned to the primary litigation.

**THEREFORE**,

**IT IS HEREBY ORDERED** that the First Amended Motion to Intervene for Sole Purpose of Participating in Preparation of Jury Instructions, filed June 10, 1998 **[Doc. No. 191]** be, and hereby is, **denied**.

**IT IS FURTHER ORDERED** that Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Nieto, filed August 17, 1998 **[Doc. No. 197]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Gonzales, filed August 17, 1998 **[Doc. No. 199]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff DeBaun, filed August 17, 1998 **[Doc. No. 201]** Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Netsch, filed August 17, 1998 **[Doc. No. 203]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff Sanchez, filed September 28, 1998 **[Doc. No. 246]**, Defendant Kapoor's Motion for Summary Judgment Regarding Claims made by Plaintiff DeLosSantos, filed September 28, 1998 **[Doc. No.**

250], and Defendant Kapoor's Motion to Strike "Plaintiff Response to Dr. Kapoor's Motion for Summary Judgment Regarding Claims made by Phyllis DeBaun", filed October 5, 1998 [**Doc. No. 254**] be, and hereby are, **denied in part**.

**IT IS FURTHER ORDERED** that Count VII of Plaintiffs' First Amended Complaint be, and hereby is, **dismissed**.

**IT IS FURTHER ORDERED** that case number CIV 96-1623 JC/DJS be, and hereby is, **reassigned** to Judge Martha Vázquez.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Counsel for Plaintiffs
Randy K. Clark
Tandy L. Hunt
Kathryn A. Hammel

Counsel for Defendant
Mark D. Jarmie
Gerald G. Dixon
John Michael Roberts

Counsel for Intervenors
William C. Madison
Scott E. Turner