# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ANNA NIETO, BETTY DELOSSANTOS,
PATRICK SANCHEZ, SALLY NETSCH,
PHYLLIS DEBAUN, and MARY GONZALES,

      Plaintiffs,

vs.                                    No. CIV 96-1225 MV/JHG

QUDRAT KAPOOR,

      Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS MATTER** is before the Court on a bench trial held from February 17 through February 28, 2000. The Court having considered the pleadings, trial testimony, exhibits, relevant law, and being otherwise fully informed, finds that Defendant Dr. Qudrat Kapoor did create a sexually and/or racially hostile work environment as to Plaintiffs Betty DeLosSantos, Sally Netsch, Phyllis DeBaun, Patrick Sanchez, and Mary Gonzales, but not as to Plaintiff Anna Nieto. The Court finds that Dr. Kapoor retaliated against Ms. Netsch and Mr. Sanchez for protected speech in violation of the First Amendment, but did not retaliate against Ms. DeBaun, Ms. Nieto, Ms. Gonzales, or Ms. DeLosSantos for constitutionally protected speech. Finally, the Court finds that Dr. Kapoor intentionally inflicted emotional distress on Ms. DeLosSantos, Ms. Netsch, Ms. DeBaun, Mr. Sanchez, and Ms. Gonzales but not on Ms. Nieto.

## I. BACKGROUND

This is a hostile environment case against Dr. Qudrat Kapoor, the Medical Director of the

Radiation Oncology Department of the Eastern New Mexico Medical Center ("ENMMC"), brought by six former employees of ENMMC who worked with Dr. Kapoor. Plaintiffs initially named ENMMC and a number of ENMMC supervisors as defendants (collectively "ENNMC Defendants"). The ENMMC Defendants have settled with Plaintiffs and have been dismissed. Therefore, Dr. Kapoor is the sole remaining Defendant. The Court has previously dismissed Plaintiffs' negligence and prima facie tort claims and their conspiracy claims under 42 U.S.C. § 1985, and Plaintiffs withdrew their contract claims. Accordingly, remaining are three causes of action against Dr. Kapoor: (1) § 1983 claims for creating racially and/or sexually hostile work environments in violation of the Equal Protection Clause; (2) § 1983 claims for retaliating against Plaintiffs after they complained about Dr. Kapoor's conduct in violation of the First Amendment; and (3) tort claims for intentional infliction of emotional distress.[1]

Before making its findings of fact and conclusions of law, the Court will explain the credibility determinations upon which its findings are based. Plaintiffs testified that Dr. Kapoor systematically treated female and Hispanic employees and patients worse than male and White employees and patients. Dr. Kapoor disputed almost all of Plaintiffs' specific testimony about gender and race-based harassment. The Court is therefore required to assess the credibility of the witnesses and make numerous determinations regarding whose version of the facts was most believable. There was testimony by witnesses other than Plaintiffs regarding Dr. Kapoor's

---

[1]Defendant states in his Supplemental Requested Findings of Fact and Conclusions of Law that some of the Plaintiffs have not stated one of the various claims. For example, he states that some of the Plaintiffs have not claimed retaliation in violation of the First Amendment. However, Defendant cites no authority for this proposition. Certainly, all six Plaintiffs made a claim of retaliation in their complaint and the Court has neither dismissed any of the retaliation claims nor granted summary judgment as to them. Therefore, the Court is unaware on what basis Defendant makes these assertions and will proceed to assess each of the three claims as to each Plaintiff.

mistreatment of female and Hispanic staff and patients, testimony which included specific instances of mistreatment. For example, Virginia Torrez who worked as the receptionist at the Cancer Center for approximately one year – ten months in Medical Oncology and two months in Radiation Oncology, was called by Plaintiffs as a witness. She testified that one day Dr. Kapoor grabbed her shoulder and shoved her down the hall, though Dr. Kapoor testified that he never pushed or shoved employees. The Court found Ms. Torrez credible and that she has no reason to testify untruthfully. Another example of testimony by a non-party witness corroborating Plaintiffs' testimony is that of Frank Sanchez who was the radiation therapist at ENMMC before Plaintiff Phyllis DeBaun. He testified that he heard Dr. Kapoor refer to Plaintiff Patrick Sanchez and himself as "stupid, lazy Mexicans," in keeping with the Plaintiffs' testimony and contradicting Dr. Kapoor's testimony. Frank Sanchez also testified as to Dr. Kapoor's mistreatment of Plaintiff Betty DeLosSantos, including grabbing and pushing her down the hall and calling her stupid, incompetent and slow. Further, Ms. Shelda Strahan, the ENMMC educator, heard Dr. Kapoor say loudly to two people in the patient waiting room that they "wouldn't have had to wait so long if we didn't have so many Mexicans." Wayne Stockburger, the administrative director of the Cancer Center, testified through deposition testimony that in meetings with staff Dr. Kapoor had laughed, as several of the Plaintiffs testified, but which Dr. Kapoor denied.

Also supporting Plaintiffs' credibility are several documents including: Mr. Stockburger's detailed notes regarding Plaintiffs' complaints to him about Dr. Kapoor,[2] a memorandum from

_____

[2]Mr. Stockburger testified that he gave Plaintiffs a copy of the notes he took at ENMMC regarding Plaintiffs' complaints about Dr. Kapoor and his discussions with Dr. Kapoor and administrators about problems in the department when one of the Plaintiffs' attorneys threatened that if he did not cooperate he would be named in this lawsuit. While the Court does not condone this behavior, it has no reason to doubt the authenticity of Mr. Stockburger's notes and Defendant

Susan Craig Fish regarding Plaintiffs' complaints about Dr. Kapoor, a written complaint filed by Mary Gonzales regarding an incident with Dr. Kapoor, documentation indicating that Betty DeLosSantos went to the emergency room and told the physician that she was having problems with the doctor for whom she worked, and notes taken by Pam McArthur, the Employee Assistance Program counselor, when she met with the Plaintiffs regarding the stress caused by Dr. Kapoor's harassment. This documentation supports the individual instances of harassment alleged by Plaintiffs and denied by Dr. Kapoor.

Further undercutting Dr. Kapoor's credibility is his testimony at an Order to Show Cause hearing on February 10, 2000 at which he stated that he had been trying to access copies of his tax returns through his accountant and his own records that the Court compelled him to produce on January 18, 2000. However, his accountant testified at a deposition on February 12, 2000 that the first time Dr. Kapoor had asked him to fax the tax returns was on February 10, 2000 and that he could have faxed the returns before that had he been requested to do so.

Several witnesses called by both Plaintiffs and Defendant testified that they never heard Dr. Kapoor make derogatory comments about women or Hispanics. Plaintiffs and Frank Sanchez testified that Dr. Kapoor did make racial slurs and comments insulting women. That some persons with whom he worked did not hear Dr. Kapoor make these comments does not mean they were not made. Given the abundance of evidence and testimony supporting Plaintiffs' claims of mistreatment by Dr. Kapoor and the specificity and consistency of those claims, the Court finds

has not questioned their legitimacy.

the Plaintiffs' testimony more credible than Dr. Kapoor's blanket denials.[3]

The Court will now issue its findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II. FINDINGS OF FACT

1.  Plaintiffs at all times material to this action were employees of the Radiation Oncology Department of the Eastern New Mexico Medical Center ("ENMMC" or "Radiation Oncology") in Roswell, New Mexico. ENMMC operated a Cancer Center with two departments – Radiation Oncology and Medical Oncology. The two departments shared a waiting room and were directly next to one another.

2.  At all material times ENMMC was a public county hospital owned by Chaves County, New Mexico, and was accordingly a political subdivision. ENMMC operated pursuant to and under the New Mexico Hospital Funding Act for governmental hospitals. ENMMC utilized its governmental entity status so as to avoid paying jury fees in civil litigation. ENMMC as a governmental entity invoked the benefits and protections of the New Mexico Tort Claims Act, NMSA 41-4-1, *et. seq*. As a governmental entity ENMMC was regulated by and operated pursuant to the New Mexico Open Meetings Act. The members of the ENMMC Board of Trustees were appointed by the Chaves County Board of Commissioners.

3.  Chaves County sold ENMMC on March 31, 1998.

4.  While working in Radiation Oncology, Plaintiffs' administrative supervisor was Wayne

---

[3]All of the Plaintiffs testified that Dr. Kapoor pointed at them close to their faces when he got angry and yelled at them. However, Dr. Kapoor insisted at trial that he never pointed at anyone in the workplace, suggesting that he may have counted with his fingers. The Court does not find Dr. Kapoor's testimony in this regard believable.

Stockberger or Jerry Gant and their medical supervisor was Dr. Qudrat Kapoor. Dr. Kapoor supervised the patient treatment and care which was the majority of Plaintiffs' work.

**A.      Dr. Qudrat Kapoor**

5.      At all times material to this action Dr. Kapoor was the Medical Director of the Radiation Oncology Department at ENMMC. Dr. Kapoor has a masters degree, three Ph.D. degrees, and an M.D. degree.

6.      Dr. Kapoor was not an employee of ENMMC.  He and ENMMC operated under a contractual "Consulting Service and Lease Agreement" wherein Dr. Kapoor was granted professional privileges at ENMMC, leased office space at ENMMC, directed patient care and treatment efforts within the Radiation Oncology Department, and split patient fees with ENMMC.

7.      Dr. Kapoor did not have the authority to hire, fire or officially discipline Radiation/Oncology employees.  However, as the Medical Director of Radiation Oncology, Dr. Kapoor did influence staffing decisions.  He interviewed and evaluated potential employees,  discussed with the Administrative Director problems with employees and his recommendations for staffing patterns; directed most of the Radiation Oncology employees' work; and had authority to issue keys to the facility at his discretion.

8.      Dr. Kapoor, as a physician at ENMMC, agreed to abide by ENMMC's medical staff bylaws, rules and regulations.

9.      Under ENMMC Policies and Procedures, Dr. Kapoor was responsible for:

• Making decisions concerning diagnosis and treatment therapy;

- Ordering necessary treatment modes for patients;

- Developing standing orders for treatment of potential complications of radiation therapy;

- Informing Radiation Oncology staff of new developments in treatment and updating their knowledge of radiation treatment protocols;

- Establishing goals of treatment for each individual patient and informing staff personnel of the goals and the expected outcomes; and

- Educating the medical staff in the care of the cancer patient.

10. Dr. Kapoor frequently degraded the Plaintiffs in their workplace at ENMMC based on their race or sex. Defendant Kapoor knew and was given notice that his derogatory comments regarding and mistreatment of women and Hispanics were inappropriate, offensive and unwelcome in the Plaintiffs' workplace at ENMMC. Wayne Stockburger talked to Dr. Kapoor on numerous occasions about his inappropriate behavior.

11. As a result of Defendant Kapoor's mistreatment of the Plaintiffs, each sought counseling and help from Pam McArthur, the Employment Assistance Program counselor at ENMMC.

**B. General Race-Based Hostile Work Environment**

12. Dr. Kapoor made racially discriminatory remarks regarding Hispanics at ENMMC, including that Hispanics were "stupid, lazy Mexicans"; that everything was "mañana, mañana";[4] that the staff had to take siestas; and that he would hire Mexicans to run a farm and pay them only two to three dollars per hour so that he could get rich.

13. During a 1994 in-service training at the ENMMC Cancer Center, Ms. Shelda Strahan, the

---

[4] "Mañana" is Spanish for tomorrow and morning.

ENMMC educator, heard Dr. Kapoor say loudly to two people that they "wouldn't have had to wait so long if we didn't have so many Mexicans." The comment was made in the patient waiting room and Patrick Sanchez was also present.

14. Dr. Kapoor discriminated in his treatment of patients, giving more time and attention to White patients than to Hispanic patients.

15. On more than one occasion, Dr. Kapoor refused to treat patients who were Hispanic or African-American.

16. Sally Netsch observed that Dr. Kapoor would physically touch White patients, would only touch Hispanic patients while wearing gloves, and would not touch African-American patients.

17. The Radiation Oncology staff gave extra meals to a patient – a poor, elderly Hispanic man from San Patricio who had to wait at the hospital for hours for his ride home. One day Ms. Netsch was bringing in a meal for the patient when Dr. Kapoor saw her and yelled asking what she was doing. Ms. Netsch explained that the patient had nowhere else to go and Dr. Kapoor told her she could not give the patient the food. Dr. Kapoor took the tray of food from Ms. Netsch's hands and threw it in the garbage can in front of the patient. The patient gave Ms. Netsch as pat on the back to comfort her as she stood there with tears in her eyes.

## C. General Gender-Based Hostile Work Environment

18. Dr. Kapoor treated female staff members markedly worse than male staff. In addition to making derogatory comments about women and their roles, he threw patient medical records files, laboratory reports, and packets of x-rays toward them; repeatedly ignored them; relied on male instead of female staff members, even if the female staff were more significantly

experienced; and required them to do menial, non-medical tasks.

19.  Ms. Virginia Torres, a former receptionist at the Cancer Center, testified that Dr. Kapoor grabbed and shoved her down the hall after which she demanded a transfer out of the department.

20.  Dr. Kapoor told Patrick Sanchez that women were weak and whiny.

21.  Dr. Kapoor was cruel to several female patients, refusing to protect their privacy and modesty, intentionally inflicting pain on them and unnecessarily displaying their bodies to male staff.

22.  Dr. Kapoor told Mr. Sanchez that it was a particular breast cancer patient's own fault that her husband was being unfaithful to her because she was weak and should be home with her family rather than working in a furniture store. She had reconstructed surgery on her breasts and Dr. Kapoor, motioning to her breasts, stated that she should be home pleasing her husband.

23.  Jan Jordan who worked as a nurse in Radiation Oncology saw Dr. Kapoor thump repeatedly on the chest of a female patient six weeks after her mastectomy surgery while the patient cried and told him it hurt. It is medically proper to palpate the surgical site of a breast cancer patient to check for recurring tumors and to see if the cancer has metastasized. If only one breast was diagnosed with cancer it is also appropriate to check the other breast for any abnormality. "Palpating" consists of putting pressure on the area the doctor is examining with the tips of his or her fingers with varying degrees of pressure. As Dr. Kapoor admitted during trial, "thumping" is not part of "palpating" in the treatment process and there is no reason to thump on a surgery site.

24. When a female legal secretary from Artesia presented for radiation treatment, Dr. Kapoor called three male staff – Patrick Sanchez, the dosimetrist, a temporary radiation therapist named Evan, and Richard Garcia, a radiation tech – into the room as he exposed the patient's genital area. The patient cried and Mr. Sanchez was embarrassed, feeling he was being compelled to witness the patient be violated. There was no medical need for Mr. Sanchez to be present and Dr. Kapoor never explained why he called Mr. Sanchez into the room. The patient had been receiving treatment at the Cancer Center for several weeks and was friendly to the staff, including Mr. Sanchez.

25. After Plaintiffs left Radiation Oncology, Dr. Kapoor continued to ignore and mistreat women with whom he worked at ENMMC including his female co-worker Dr. Mango, a board certified radiation oncologist, and his nurse, Caroline Donika. Dr. Kapoor refused to acknowledge Dr. Mango's presence, interrupted her patient examinations, and feigned sleep during Dr. Mango's presentations to the tumor board. Dr. Kapoor interrupted Ms. Donika requiring her to respond to his needs immediately and interrupted conversations between Ms. Donika and Dr. Mango. Moreover, Dr. Kapoor continued to throw patient charts and x-rays towards female staff.

### D. Wayne Stockburger

26. Wayne Stockburger was the Administrative Director of the Cancer Center during most of Plaintiffs' employment.

27. Mr. Stockburger documented and addressed staff complaints regarding Dr. Kapoor's disruptive and hostile behavior including ethnic slurs and gender discrimination. Mr. Stockburger documented Dr. Kapoor's inappropriate conduct and noted the pattern of

retaliation and discrimination against the Plaintiffs who reported Dr. Kapoor's abuse.

28.     Mr. Stockburger organized a staff meeting to discuss the staff complaints about Dr. Kapoor. Present at the meeting were Mr. Stockburger, Dr. Kapoor, Phyllis DeBaun, Betty DeLosSantos, Magdiel Martinez, Sally Netsch, Patrick Sanchez, and Paula Baker. When Ms. DeBaun began to express her concerns, Dr. Kapoor laughed, put his head down on the table, and grabbed Mr. Stockburger's arm repeatedly, distracting him from listening to Ms. DeBaun's concerns. Dr. Kapoor then went around the room, pointing in each staff member's face in turn, and loudly asking each: "Do you have a problem with me?" Ms. Netsch found Dr. Kapoor's conduct intimidating and told Mr. Stockburger she felt it was inappropriate.

### E.     Sally Netsch

29.     Sally Netsch was a registered nurse in ENMMC's Radation Oncology Department from September of 1994 to May of 1995. When she began working at ENMMC, Ms. Netsch had fifteen years of nursing experience.

30.     Ms. Netsch is a White woman of Scottish descent.

31.     Ms. Netsch heard Dr. Kapoor say that women were sensitive, whiny, useless, and the "weaker sex."

32.     Dr. Kapoor called Ms. Netsch overly sensitive and a whiny female on several occasions.

33.     Dr. Kapoor told Ms. Netsch that he thought women's main purpose was to serve men.

34.     Dr. Kapoor told Ms. Netsch on two occasions that the only reason women get married is to get men's money.

35.     Dr. Kapoor told Ms. Netsch that the only thing women are good for is, number one, to be your lover when they are young and then to provide you with children and then to take care

11

of you in old age.

36. Dr. Kapoor told Ms. Netsch that by working full-time, she was abandoning her babies.

37. Dr. Kapoor told Ms. Netsch that he felt women should not work full-time out of the household.

38. On one occasion, Ms. Netsch expressed to Dr. Kapoor, with Mr. Stockburger present, concerns she had about the way Dr. Kapoor had treated a particular patient. Dr. Kapoor got very upset, yelling at Ms. Netsch, calling her stupid and telling her she did not understand radiation treatment.

39. During the latter portion of Ms. Netsch's tenure at ENMMC Dr. Kapoor became increasingly impatient with her. He would yell at her when she asked him a question about patient treatment, calling her stupid in a loud, angry voice and pointing his finger in her face.

40. Dr. Kapoor grabbed things out of Ms. Netsch's hands and threw pens, pencils, medical files and records at her.

41. Dr. Kapoor pushed Ms. Netsch to force her to move faster down the hallway. Ms. Netsch also observed Dr. Kapoor push Betty DeLosSantos, Phyllis DeBaun, and Patrick Sanchez.

42. Dr. Kapoor never physically injured Ms. Netsch.

43. Dr. Kapoor discussed his sexual activities with White male patients in Ms. Netsch's presence. On one occasion Dr. Kapoor told a patient that there was a woman who wanted to check his toenails before she would have sex with him.

44. In addition to the abuse and derogatory comments directed towards her, Ms. Netsch witnessed Dr. Kapoor abuse and degrade other women in Radiation Oncology. She witnessed Dr. Kapoor yell at Betty DeLosSantos and grab and pull her down the hall. She

also observed Ms. DeLosSantos scurry down the hall in an effort to avoid contact with White patients as Dr. Kapoor had ordered. Ms. Netsch witnessed Dr. Kapoor refuse to interact with Phyllis DeBaun, looking instead to less-experienced male employees.

45. Ms. Netsch observed Dr. Kapoor treating female patients differently than male patients, giving them less privacy, time and respect.

46. Ms. Netsch was mistreated by Dr. Kapoor on a daily basis and observed Dr. Kapoor treat female staff and patients worse than male staff and patients on a daily basis.

47. Ms. Netsch was present when Dr. Kapoor examined female patients in the radiation treatment room rather than the exam room. The treatment room was poorly lit and had tables that were uncomfortable for patients.

48. Dr. Kapoor treated a female government employee for breast cancer. Ms. Netsch was present during one occasion when Dr. Kapoor was using an alcohol swab to erase the temporary electron marks from the patient's breast. There were no marks on the patient's nipple, but Dr. Kapoor swiped the nipple with the swab and her nipple became erect. Dr. Kapoor became excited, pointed his finger and said "look at this." Dr. Kapoor then pulled the drape off the patient's other breast which was not being treated and did not have markings on it. He touched that nipple with the alcohol swab, causing it to be stimulated and called to the male staff members to look at it. The patient turned her head away with tears in her eyes.

49. Ms. Netsch was aware of two patients who Dr. Kapoor refused to treat because of their inability to pay for the treatment– a young, Hispanic woman from Carlsbad and an African-American woman. In both cases he refused treatment before examining them. Dr. Kapoor did look at the second patient's affected area – her leg, but he did not touch her. He had Ms.

Netsch pull up the patient's gown so that he could see her leg.

50. Ms. Netsch complained to Wayne Stockburger several times and to Susan Craig Fish about Dr. Kapoor's conduct including his mistreatment of Hispanic and female staff and patients.

51. Ms. Netsch saw Pam McArthur for one counseling session two days before leaving ENMMC for work-related problems. Ms. Netsch noted that she had not been sleeping well and had lost ten pounds.

52. Dr. Kapoor was at times noticeably more angry at Ms. Netsch the day after she complained about his conduct. On one instance after Ms. Netsch complained about the female patient who left crying after being mistreated by Dr. Kapoor, Dr. Kapoor became extremely angry about Ms. Netsch complaining about his conduct, yelling at Ms. Netsch in Mr. Stockburger's presence.

53. Ms. Netsch was shocked and angered by Dr. Kapoor's derogatory comments about women. Though she had substantial nursing experience and confidence in herself as a nurse before working at ENMMC, Dr. Kapoor's comments made Ms. Netsch doubt her abilities as a nurse.

54. Because of Dr. Kapoor's conduct, Ms. Netsch went home crying several days, lost approximately 20 pounds, had headaches, and drank alcoholic beverages on a regular basis.

55. Dr. Kapoor's conduct and comments were one of the reasons Ms. Netsch left her job. Family considerations contributed to the decision to move her family back to Vermont, including concern about gang activity in Roswell, a desire to return to friends and family in Vernmont, and difficulty in getting the schools in Roswell to accommodate Ms. Netsch's son with a hearing disability.

56. Dr. Kapoor's behavior damaged Ms. Netsch and her relationships with her children and her

husband.

57.  Ms. Netsch submitted her first letter of resignation to ENMMC within weeks of beginning her employment there, because of Dr. Kapoor's treatment of the staff. Wayne Stockburger encouraged her to stay and she did so.

58.  Ms. Netsch's final letter of resignation indicates that she found "continuing to work with Dr. Kapoor to be impossible."

59.  At ENMMC, Ms. Netsch had been working a full-time day shift with no requirement to work weekends or holidays. Her rate of pay was $17.00/hour.

60.  After leaving ENMMC, Ms. Netsch moved with her family back to Rutland, Vermont.

61.  After returning to Vermont, Ms. Netsch was unemployed for approximately eleven weeks. No hospital in the area was hiring full-time personnel and there were no oncology positions available. Starting on July 24, 1995, Ms. Netsch was able to find half-time (50%) employment at the Rutland Regional Medical Center in the surgical unit, working 11 p.m. to 7 a.m. at a rate of $15.50 per hour. This job required Ms. Netsch to work every other weekend and holidays. After several months, she was able to increase her position on the night shift to a 70% time position at $16.32 per hour. More than a year later, Ms. Netsch was able to change to a 90% position on an evening shift. In November of 1999, Ms. Netsch was able to move to a day shift at a rate of $17.83 per hour, but this too was a part-time, 70% position. Ms. Netsch is still not working in her area of expertise in oncology.

62.  Because she was working different shifts not compatible with her husband and children's schedules, Ms. Netsch missed many school functions, such as concerts, back to school nights, teacher/parent conferences, and sports practices, as well as family holidays and weekends.

### F.    Phyllis DeBaun

63.    Phyllis DeBaun is a certified radiation therapist who worked in Radiation Oncology from September of 1994 to the end of May, 1995.  She had fourteen years of radiation therapy experience prior to working at ENMMC.

64.    Ms. DeBaun is a White woman.

65.    The other radiation therapist in Radiation Oncology during the time Ms. DeBaun worked there was Magdiel Martinez who came to ENMMC directly from school and became a certified therapist during Ms. De Baun's tenure at ENMMC.  He was familiar with the machines at ENMMC when Ms. DeBaun arrived at the Radiation Oncology Department.

66.    Also at the ENMMC Cancer Center was a technical aide – Richard Garcia, who was not formally trained in radiation therapy, but had worked at ENMMC for five to six years when Ms. DeBaun began.

67.    When Ms. DeBaun went to Dr. Kapoor with questions regarding patient treatment he attacked her verbally, telling her in a loud, angry voice that she should not concern herself with such matters and flipping her away with his hands.  This happened at least daily.

68.    In approximately Ms. DeBaun's fifth week working at ENMMC, Dr. Kapoor confronted her about having given a tube of Aquaphor cream – a rehydrating ointment, to a patient.  The cream was medically contraindicated.  Ms. DeBaun had been instructed by the nurses that if a patient who had already been given Aquaphor ran out, she should give them a refill.  Dr. Kapoor came from an examination room with the tube of ointment, yelling at Ms. DeBaun, asking her what she was doing, saying she was neither a doctor nor a nurse and should not be prescribing medication.  He held the tube within an inch or two of her face.  When Ms.

DeBaun tried to explain why she had given the patient the cream, Dr. Kapoor continued to yell at her. Ms. DeBaun complained to Pat Sanchez and Wayne Stockburger about this incident.

69. On one occasion when Ms. DeBaun attempted to ask Dr. Kapoor about what she feared was a mistake in the radiation therapy simulation film, he became very angry, yelling at Ms. DeBaun, pointing his finger at her and telling her and the other staff that they did not know what they were doing.

70. On several occasions, Dr. Kapoor requested that male employees with significantly less experience in radiation therapy than Ms. DeBaun assist him instead of her, for example, asking them to do simulations or make changes on patients' treatment areas.

71. On one occasion, Ms. DeBaun attempted to ask Dr. Kapoor about a boost radiation treatment and how he wanted her to prepare for the treatment. Dr. Kapoor completely ignored her, refused to respond to her and walked away from her quickly. When he got to the room, he told the less qualified male technical aide how to prepare for the treatment.

72. On a daily basis, Dr. Kapoor gave instructions on patient care to male staff members who were less qualified than Ms. DeBaun, rather than communicate directly with her.

73. For months Dr. Kapoor physically prevented Ms. DeBaun from doing her work. For example, once when Ms. DeBaun was trying to enter a simulation room, Dr. Kapoor grabbed the door and held his hand in front of her face, saying that it was unnecessary for her to come into the room. He shooed her away with his hand.

74. When Ms. DeBaun questioned an inappropriate use of x-rays on a patient, Dr. Kapoor ordered her to proceed. Ms. DeBaun related her concerns to the male radiation therapist.

The male therapist related the same concerns to Dr. Kapoor and Dr. Kapoor listened to him and halted the treatment.

75. Dr. Kapoor frequently ignored Ms. DeBaun's questions, as though she had not spoken, and waited for one of the less qualified male staff members to arrive before giving his instructions to them.

76. On one occasion Ms. DeBaun noticed that an x-ray was hanging backwards, so she reached up to turn it around. Dr. Kapoor slapped her hands away, saying she should not be doing that.

77. Dr. Kapoor grabbed Ms. DeBaun, pushing her down the hall approximately six times. Ms. DeBaun also saw Dr. Kapoor do this to Betty DeLosSantos and Patrick Sanchez three to four times weekly, but not to any of the other male staff.

78. Dr. Kapoor threw x-rays and patient charts at Ms. DeBaun.

79. Ms. DeBaun saw Dr. Kapoor fail to provide female patients with appropriate modesty. She saw him rip drapes off of female patients, and unnecessarily disrobe areas, such as breasts that were not being treated.

80. On one occasion Ms. DeBaun observed Dr. Kapoor pull the nipple of a cancer patient whose breasts had been treated. He pulled the nipple so hard that it popped back and the patient "practically came off the table." The nipple became erect and Dr. Kapoor went and called two male staff into the room – Magdiel Martinez and Richard Garcia. Dr. Kapoor then disrobed the other breast, pulled on the nipple until it became erect and pointed it out to the male staff. The patient turned her head and cried. Ms. DeBaun was very upset to see this mistreatment.

81. Dr. Kapoor told Ms. DeBaun that women had one purpose – to serve men sexually.

82. Ms. DeBaun heard Dr. Kapoor say that women should stay home with their babies and not work outside the home.

83. Dr. Kapoor asked Ms. DeBaun why she had not given her second husband a child and why she had left her first husband if she had given him a child.

84. Ms. DeBaun witnessed Dr. Kapoor mistreat other female members of the staff. She saw him yell at Sally Netsch and point his finger in her face and saw him throw charts and x-rays at Betty DeLosSantos. She also saw Dr. Kapoor tell Ms. DeLosSantos to fill the copier with paper, snapping his fingers at her.

85. Ms. DeBaun attempted to raise concerns she had about Dr. Kapoor at the staff meeting Wayne Stockburger organized, but Dr. Kapoor began yelling at the staff, asking who had a problem with him. Dr. Kapoor said to Ms. DeBaun, still pointing his finger in her face, "if you are going to be such a whiny woman and so overly sensitive about things, then this was never going to work and you should seek employment elsewhere."

86. After Ms. DeBaun complained about Dr. Kapoor to Mr. Stockburger, Dr. Kapoor attempted to get Ms. DeBaun's probationary employment period extended.

87. Dr. Kapoor told Ms. Netsch that Ms. DeBaun was incompetent and that he could get a monkey to do her job. Ms. Netsch also observed Dr. Kapoor relying on male therapists rather than Ms. DeBaun. Ms. Netsch observed that Dr. Kapoor would not talk directly to or look directly at Ms. DeBaun.

88. Ms. Netsch observed Dr. Kapoor push Ms. DeBaun down the hall.

89. Patrick Sanchez noted that Ms. DeBaun left work upset and cried several times. Mr. Sanchez

also saw Dr. Kapoor rely on male employees instead of Ms. DeBaun on numerous occasions.

90.  On September 24, 1994, Dr. Kapoor's anger toward Ms. DeBaun was so disruptive that she could no longer work and went home.

91.  Ms. DeBaun continued to protest Dr. Kapoor's abuse to Mr. Stockburger and Mr. Stockburger arranged a meeting with himself, Dr. Kapoor, and Ms. DeBaun.

92.  On November 3, 1994, the day before the first meeting was to take place, Dr. Kapoor told Mr. Stockburger that he had concerns about the abilities of his staff.

93.  Dr. Kapoor arrived late at the first meeting with Ms. DeBaun. Dr. Kapoor questioned Ms. DeBaun about her skill levels with the various machines. Ms. DeBaun indicated that she had been excluded from simulations. When Ms. DeBaun attempted to communicate her concerns, Dr. Kapoor said to Mr. Stockburger, "you see what I have to put up with," laughed, put his head on his hands shaking it, and then questioned her about the use the various pieces of radiation oncology equipment.

94.  At the second meeting Dr. Kapoor arrived on time and stated that there had been no performance problems with Ms. DeBaun in the past week. Ms. DeBaun had had the opportunity to participate in several simulations.

95.  Ms. DeBaun put a stop to the meetings with Dr. Kapoor because she felt they were not productive.

96.  Because of Dr. Kapoor's mistreatment of her, Ms. DeBaun had problems sleeping, had nightmares about Dr. Kapoor, lost weight, cried daily, went home exhausted each day and had migraine headaches, muscle spasms, and body aches. She also spent less time with her family. Ms. DeBaun testified that by repeatedly ignoring her, Dr. Kapoor made her feel non-

existent.

97. Ms. DeBaun saw Pam McArthur approximately five times regarding Dr. Kapoor's abuse. Ms. DeBaun was tearful when she went to see Ms. McArthur and was experiencing physical problems and inability to sleep as the result of mistreatment by Dr. Kapoor. Ms. McArthur recommended that Ms. DeBaun resume taking anti-depressants.

98. Ms. DeBaun decided she could not remain at ENMMC because of Dr. Kapoor's abusive treatment, so she moved with her family to Colorado Springs

99. Ms. DeBaun had been earning approximately $18.00 per hour working a full day shift at ENMMC. One in Colorado Springs, Ms. DeBaun was unemployed through the summer and into the fall of 1995, despite placing applications for employment throughout Colorado Springs in retail and grocery stores as well as the area hospitals. Ms. DeBaun also applied for radiation therapy jobs as far away as Pueblo and Denver, Colorado, with no success.

100. Ms. DeBaun eventually obtained part-time employment PRN (as needed) at Memorial Hospital in Colorado Springs in the cancer center in radiation oncology as a radiation therapist, earning $17.86 per hour. The hours were sporadic and unpredictable. In the winter of 1995, Ms. DeBaun was temporarily able to get full-time hours. In 1996, she returned to part-time hours.

101. Ms. DeBaun retired from radiation therapy in December of 1998 because she no longer had confidence in her ability despite her some fifteen years of experience and training.

**G. Anna Nieto**

102. Ms. Nieto was originally hired at ENMMC in the Radiation Oncology Department as a temporary employee in July of 1994. She was then hired in Radiation Oncology as a block

cutter and radiation therapy assistant from August of 1995 to July of 1996. Prior to working at ENMMC, Ms. Nieto did not have experience with radiation oncology or block cutting.

103. Ms. Nieto is a Hispanic woman.

104. While Ms. Nieto worked in Radiation Oncology, Richard Garcia was in school and assisted at ENMMC as a radiation tech and block cutter on an as-needed basis. At that time he had approximately six to seven years experience with block cutting.

105. During her July 1994 stint in Radiation Oncology, Dr. Kapoor made unwelcome sexual advances to Ms. Nieto, asking her if she had a boyfriend and offering to walk her to her car. Ms. Nieto lied, saying her boyfriend was coming to get her to avoid Dr. Kapoor's advance. She was scared when Dr. Kapoor showed an interest in her and tried to avoid him. Ms. Nieto had a previous experience of sexual harassment which led her to drop out of college. When Dr. Kapoor approached her in this way, Ms. Nieto was fearful, distressed, and discouraged that this kind of experience was happening to her again.

106. During July 1994, as Ms. Nieto followed a patient into the treatment room, Dr. Kapoor placed his hand on her lower back below her waist for several seconds, making a circular, massaging motion. This caused Ms. Nieto to tense up and become distressed. Again, Ms. Nieto avoided Dr. Kapoor as much as possible.

107. Ms. Nieto did not complain to anyone in the ENMMC administrative staff about Dr. Kapoor asking to walk her to her car or caressing her back.

108. When Ms. Nieto returned to work as a full-time employee in 1995, a patient suggested to Ms. Nieto that she date Dr. Kapoor because he was a doctor and had money. She told the patient that she was not interested in dating Dr. Kapoor. Based on the fact that Ms. Nieto

saw Dr. Kapoor speaking to the patient in the hallway directly before suggesting to Ms. Nieto that she date Dr. Kapoor, that Dr. Kapoor had made previous advances to Ms. Nieto, and that Dr. Kapoor's treatment of Ms. Nieto worsened after her refusal to date him, the Court concludes that Dr. Kapoor requested that the patient talk to Ms. Nieto about dating him.

109. After Ms. Nieto told the patient she did not want to date Dr. Kapoor, his treatment of her worsened. Dr. Kapoor began to criticize her work, grab x-rays out of her hands, and belittle her in front of patients and the other staff.[5]

110. Dr. Kapoor had not criticized Ms. Nieto's work before her statement to the patient that she would not date Dr. Kapoor.

111. Ms. Nieto heard Dr. Kapoor telling someone at the workplace, "mañana, mañana, lazy Mexicans."

112. Ms. Nieto heard Dr. Kapoor saying that his staff was not back from lunch because they were on siestas.

113. In December 1995, Magdiel Martinez and Patrick Sanchez expressed concerns to Mr. Stockburger that Dr. Kapoor had begun to harass Ms. Nieto.

114. Dr. Kapoor's criticisms of Ms. Nieto's work reduced her to tears at the hospital three or four times. Once, Mr. Martinez saw her crying in the block cutting room.

115. On one occasion when Dr. Kapoor rejected one of Ms. Nieto's blocks, he ordered Mr. Garcia to re-cut it for her. Instead, Ms. Nieto re-cut the block herself. Thinking that Mr. Garcia, a male, had cut the second block, Dr. Kapoor found it acceptable.

---

[5]Ms. Nieto testified at trial that Dr. Kapoor threw x-rays with force in her direction. However, at her deposition she testified that she had never seen him throw things.

116.   In June of 1996, during a period of time when the radiation treatment machine was broken,
       Mr. Sanchez called Ms. Nieto in to work on a radiation simulation of a patient.  Ms. Nieto
       came to the hospital wearing clothes that were not appropriate for the work setting – jeans
       and a t-shirt.  When she arrived, Dr. Kapoor screamed "what is she doing here?" in front of
       the patient, Mr. Martinez and Mr. Garcia.  Ms. Nieto explained that she was there to the cut
       the blocks.  Dr. Kapoor said he did not need her because he had Mr. Garcia.  Dr. Kapoor said
       someone should contact Jerry Gant to get Ms. Nieto out of the room.

117.   Ms. Nieto contacted Jerry Gant and went to see Pam McArthur about the incident in which
       Dr. Kapoor told her to leave the simulation room.  Ms. Nieto filed a written grievance against
       Dr. Kapoor with the hospital's human resources administrator, Susan Craig Fish, who
       investigated the incident.  During her investigation, Mr. Martinez stated that Dr. Kapoor had
       in fact raised his voice at Ms. Nieto and that after Dr. Kapoor threw Ms. Nieto out of the
       simulation room, the patient asked Mr. Martinez if Dr. Kapoor was crazy.

118.   Ms. Nieto never heard Dr. Kapoor make derogatory comments about women to her or in her
       presence.  Dr. Kapoor never made racially discriminatory comments to her.

119.   Ms. Nieto saw Pam McArthur for two counseling sessions about several issues – problems
       in the workplace, her mother's recent surgery, financial problems, and the difficulties of being
       a single parent.  The second session focused on being ridiculed by Dr. Kapoor in front of a
       patient the day he required her to leave the simulation room.  Ms. Nieto was crying and
       distraught when she saw Ms. McArthur about that incident.

120.   While working in Radiation Oncology, Ms. Nieto experienced sleep problems.  She continues
       to have nightmares about Dr. Kapoor.

121. Ms. Nieto left the Oncology Radiology Department for unexplained periods of time during her work hours.

122. Wayne Stockburger recommended that Ms. Nieto's position be eliminated and that a third radiation therapist be hired instead.

123. Less than one month after Dr. Kapoor made Ms. Nieto leave the simulation room, Mr. Stockburger told Ms. Nieto she should start to look for another position.

124. Ms. Nieto was initially able to transfer to another job in ENMMC working nights in the emergency room. The night hours made it difficult for Ms. Nieto to care for her child and exposed her to guns and gang activity, so she left that position.

125. Ms. Nieto earned $6 per hour in Radiation Oncology and $7.55 per hour in the emergency room.

126. Ms. Nieto later obtained another job with a dentist, but she was fired when she asked for two days off to give her deposition in this case. Ms. Nieto ultimately went back to school and is currently completing her training in respiratory therapy, living on student loans and child support payments. Because of Dr. Kapoor, she is apprehensive about working at ENMMC in the future.

### H.      Patrick Sanchez

127. Patrick Sanchez was the dosimetrist in the Radiation Oncology Department from May of 1993 to August of 1996. He had fifteen years of biomedical physics and dosimetry experience when he began at ENMMC.

128. Mr. Sanchez is a Hispanic man.

129. Dr. Kapoor suggested to Mr. Sanchez that they should get together, start a farm, hire a bunch

of "wetbacks," pay them two to three dollars per hour, and make a lot of money.

130. Patrick Sanchez witnessed Dr. Kapoor's mistreatment of other Hispanic staff and heard Dr. Kapoor make racially derogatory comments. In Patrick Sanchez' presence, Dr. Kapoor said that Frank Sanchez was a very stupid person, that he did not know what he was doing, and that he was a "stupid, lazy Mexican." Dr. Kapoor told Mr. Sanchez that Betty DeLosSantos was stupid, that she could not be trusted, that she lied, and that she was " a lazy Mexican." Mr. Sanchez heard Dr. Kapoor tell Ms. DeLosSantos not to have contact with a particular patient – the wife of a rich man who worked in the oil industry, because Ms. DeLosSantos was "not of her kind." Dr. Kapoor told Mr. Sanchez that Mary Gonzales was a lazy Mexican and that she did not know what she was doing.

131. On several occasions when Mr. Sanchez raised a concern with Dr. Kapoor about patient treatment, Dr. Kapoor yelled at Mr. Sanchez, calling him stupid, and pointing his finger in Mr. Sanchez' face.

132. Dr. Kapoor told Patrick Sanchez that he was a "stupid, lazy Mexican" and that he did not know what he was doing.

133. Dr. Kapoor pushed Mr. Sanchez down the hall.

134. Ms. Gonzales heard Dr. Kapoor yell at Mr. Sanchez.

135. Dr. Kapoor told Ms. Netsch that Mr. Sanchez was a "lazy Mexican" who did not understand radiation therapy.

136. Frank Sanchez, a certified radiation therapist at ENMMC, heard Dr. Kapoor refer to Patrick Sanchez and Frank Sanchez as "stupid, lazy Mexicans."

137. Mr. Sanchez repeatedly reported to Mr. Stockburger that Dr. Kapoor mistreated the staff.

138. On April 10, 1995, Dr. Kapoor reported to Mr. Stockburger that he was losing confidence in Mr. Sanchez.

139. On April 18, 1995, Mr. Sanchez reported to Mr. Stockburger that Dr. Kapoor was treating Ms. DeLosSantos "like dirt" and was screaming at the staff and at patients. Mr. Sanchez reported that he felt Dr.Kapoor was trying to get rid of him by mistreating him.

140. Two days later, on April 20, 1995, Mr. Stockburger met with Dr. Kapoor to discuss Dr. Kapoor's behavior in the department. Dr. Kapoor complained to Mr. Stockburger about Mr. Sanchez' work and said that Mr. Sanchez could not be trusted anymore.

141. After this meeting, Dr. Kapoor's treatment of Mr. Sanchez worsened.

142. On April 26, 1995, Mr. Stockburger scheduled a meeting with himself, Mr. Sanchez, and Dr. Kapoor. During the meeting Dr. Kapoor rarely spoke and only addressed Mr. Sanchez directly when Mr. Stockburger asked him to do so. When Mr. Sanchez attempted to express his concerns, Dr. Kapoor laughed, grabbed Mr. Stockburger's hand and arm, and placed his head down in his arms which were on the table, as if he were sleeping. Mr. Stockburger and Mr. Sanchez told Dr. Kapoor that his behavior was not helpful. Dr. Kapoor, while looking at Mr. Stockburger and not at Mr. Sanchez said, "If I have insulted you, I am sorry."

143. On April 27, 1995, the day after the meeting, Mr. Sanchez began counseling with Pam McArthur regarding his frustration with Dr. Kapoor's conduct. He exhibited signs of depression including sleep problems and overeating. She observed that Mr. Sanchez' personality had changed. He was less friendly and quieter. Mr. Sanchez discussed Dr. Kapoor's abusive treatment of Hispanic Medicaid patients, retaliation by Dr. Kapoor when he tried to stand up for his co-workers, racial slurs, and Dr. Kapoor's humiliation of him. Mr.

Sanchez had approximately ten sessions with Ms. McArthur.

144. At Ms. McArthur's recommendation, Mr. Sanchez went to a psychiatrist who prescribed anti-depressants for him. He discontinued the medication due to the side effects.

145. As a result of experiencing and witnessing Dr. Kapoor's mistreatment, Mr. Sanchez overate, gaining 100 pounds, and he has now been diagnosed with diabetes. Mr. Sanchez' relationship with his family has also deteriorated.

146. In July of 1995, Dr. Kapoor encouraged Mr. Stockburger to terminate Mr. Sanchez, arguing that he was unnecessary to the department, that his work was unacceptable and that the hospital could hire someone with the same experience for less money. He also complained that Mr. Sanchez was the cause of the problems in the department.

147. In June of 1995, Dr. Kapoor told Ms. Gonzales that Mr. Sanchez would not be at the Cancer Center much longer.

148. In May of 1996, Mr. Stockburger met with Mr. Sanchez to tell him that there was a plan to reorganize the department and to replace the dosimetrist position with a joint dosimetrist/radiation therapist. Mr. Sanchez told Mr. Stockburger that he believed this was being done as retribution for his complaints and allegations against Dr. Kapoor.

149. In July of 1996, Mr. Stockburger told Mr. Sanchez that his job at ENMMC was being eliminated.

150. Mr. Sanchez received $2,000 severance pay from ENMMC.

151. ENMMC replaced Mr. Sanchez with Tomas Herrera, who is a dosimetrist and radiation therapist.

152. When he lost his employment at ENMMC, Mr. Sanchez was receiving a salary of $62,500,

health insurance premiums of $250 per month; yearly social security contributions of $3,000; yearly retirement savings of $8,000 matched by the hospital in the amount of $8,000; annual raises of $3,000; and one month of vacation and four weeks of sick leave per year.

153. Mr. Sanchez was unemployed for eleven months after leaving ENMMC. He had to cash in his $75,000 retirement funds less penalty and taxes, resulting in $30,000 net proceeds.

154. Mr. Sanchez relocated from New Mexico to Washington. His salary in Washington is $53,400. In order to buy a house comparable to the one his family had in Roswell, Mr. Sanchez chose to live a considerable distance from his home. He travels five to six hours per day to and from work, whereas in Roswell he was within walking distance from his job. This extensive travel time has resulted in less time with his family and contributed to his continued depression and overweight condition.

### I. Mary Gonzales

155. Mary Gonzales worked as a nurse in the Radiation Oncology Department at ENMMC for approximately six weeks in the summer of 1995. At the time of her employment in Radiation Oncology, Ms. Gonzales was a graduate nurse who had completed her studies to become a registered nurse ("RN"), but had not passed the necessary examination. She had previously worked with cancer patients in the United States Army and had fourteen years of nursing experience.

156. Ms. Gonzales is a Hispanic woman. She was born in Mexico and moved to New Mexico when she was twelve years old.

157. Ms. Gonzales was present when Dr. Kapoor told a White female patient that her daughter had "gone down," degraded herself, and degraded the family by marrying a Hispanic man.

158. An African-American female patient came to the Cancer Center with painful mouth cancer. Dr. Kapoor looked at the patient's mouth while Ms. Gonzales was in the room, but never touched the patient. Ms. Gonzales asked Dr. Kapoor if he was going to give the patient something for her pain and he replied that he was not, that she was one of the those ladies on welfare, that she was going to die anyway, and to just do the minimum for her.

159. In front of a patient, Dr. Kapoor mocked the way Ms. Gonzales was standing, telling her that she thought she was a model.

160. After she answered a patient's questions in Spanish, Dr. Kapoor told Ms. Gonzales not to talk in "that language" any more. He told her that she was in the United States now and should speak English. This insulted Ms. Gonzales' heritage and restricted the patient's ability to get her questions answered.

161. When a former teacher of Ms. Gonzales', who was receiving treatment in Radiation Oncology brought her flowers, Dr. Kapoor suggested that he give the flowers instead to White secretary Paula Baker because Ms. Baker was "educated." Ms. Gonzales felt degraded by this comment.

162. On another occasion, this same patient who was being treated for prostate cancer came in for a treatment and Dr. Kapoor said to the patient in Ms. Gonzales' presence that "women are penis envy." The patient could not understand Dr. Kapoor, so Ms. Gonzales repeated the comment. Ms. Gonzales was embarrassed by this comment and by having to repeat it.

163. On June 12, 1995, Ms. Gonzales made a written report to Mr. Stockburger about the penis envy comment. Mr. Stockburger met with Dr. Kapoor about the incident on June 13, 1995.

164. Both at trial and at the meeting with Mr. Stockburger, Dr. Kapoor tried to explain the

comment as an attempt to return the conversation to one of a clinical nature by quoting Sigmund Freud and away from the patients' sexual comments. Ms. Gonzales testified that the patient had not made a sexual comment when Dr. Kapoor discussed penis envy and the Court finds Dr. Kapoor's explanation unbelievable. While agreeing that it is appropriate for a doctor to discuss sexual dysfunction with a prostate cancer patient, the Court finds that this was not the context in which Dr. Kapoor made the comment. If a patient had made an inappropriate sexual comment, the appropriate response was not to invoke the bizarre, outdated theory of penis envy, but rather to either tell the patient his comment was inappropriate or to return the conversation to a truly clinical one, focused on the patient's condition. The Court is at a loss as to how a discussion of penis envy made the conversation more clinical. Moreover, because Ms. Gonzales' written complaint regarding the comment is consistent with her trial testimony and the Court has several bases for doubting Dr. Kapoor's credibility, as noted above, the Court finds Ms. Gonzales' version of the incident more reliable.

165.    After Ms. Gonzales made her complaint, Dr. Kapoor began treating Ms. Gonzales worse than before. He screamed at her, excluded her from treatment areas, and threw things at her, including patient charts and lab slips.

166.    Cynthia Ball, an RN at ENMMC, submitted a written complaint to Wayne Stockburger concerning an incident in which Ms. Gonzales asked Dr. Kapoor to confirm some lab results and sign the lab slips. Ms. Gonzales referred to the final lab results as "original." Dr. Kapoor yelled at her for this mistake and threw the chart and the lab slips, some of which hit Ms. Gonzales.

167. Dr. Kapoor instructed Ms. Gonzales that she was not to go into the treatment area and that she was only to work with Spanish-speaking patients.

168. Dr. Kapoor told Patrick Sanchez that Ms. Gonzales was a "lazy Mexican" and did not know what she was doing. After Ms. Gonzales complained about Dr. Kapoor's "penis envy" comment, Mr. Sanchez noted that Dr. Kapoor acted angrily toward Ms. Gonzales, for example, throwing charts at her.

169. After she had complained about Dr. Kapoor's conduct, he yelled at Ms. Gonzales on a daily basis. Sometimes at the end of the day Dr. Kapoor would call Ms. Gonzales into his office, close the door and say that he yelled at her for her own good.

170. Ms. Gonzales saw Pam McArthur at least once to discuss Dr. Kapoor's mistreatment. She exhibited signs of depression, including losing sleep, vomiting and being unable to eat.

171. By June 22, 1995, nine days after Mr. Stockburger met with Dr. Kapoor about Ms. Gonzales' concerns, Dr. Kapoor related to Mr. Stockburger that he was beginning to question Ms. Gonzales' capabilities as a nurse.

172. On or about July 6, 1995, Patrick Sanchez reported to Mr. Stockburger that Mary Gonzales "will not tolerate the mental abuse from Dr. Kapoor much longer and will probably quit."

173. Ms. Gonzales spent two weeks serving in the National Guard during the summer of 1995. Upon her return, Dr. Kapoor was even more hostile to her. On one occasion Ms. Gonzales made a mistake. Dr. Kapoor got very angry, yelling at her that he wanted her out of there. Ms. Gonzales said she did not want to be there and that she quit. Dr. Kapoor then threw a Physician's Desk Reference ("PDR"), a hardback book approximately three inches thick, at Ms. Gonzales, hitting her in the chest.

174. Ms. Gonzales decided to leave ENMMC because of Dr. Kapoor. After the incident in which Dr. Kapoor threw the PDR at her, she went to Mr. Stockburger asking for a transfer.

175. Mr. Stockburger transfered Ms. Gonzales to the nursery, where she previously asked not to work because when she was a young girl an infant sibling of hers had died in her arms. She only worked there for two days.

176. Because of Dr. Kapoor's mistreatment Mary Gonzales suffered loss of self esteem, fear, nightmares, and sadness. Ms. Gonzales was a woman who endured many difficulties including coming into the United States at age twelve by herself, suffering ridicule at school in the United States because of her inability to speak English, serving in the United States Army and National Guard, and being a single mother. She thought of herself as strong enough to endure Dr. Kapoor's abuse, yet she felt weak by the time she left ENMMC. While working in Radiation Oncology, Ms. Gonzales frequently cried, felt nauseated, dreamt about work, was angry, had a loss of appetite and dreaded going to work.

177. At the time Ms. Gonzales left ENMMC she was earning $12.67 per hour. After leaving ENMMC she worked briefly in a nursing home working night hours for $11.50 per hour, then moved to Texas to try to find work. Ms. Gonzales is now working as a temporary nurse, traveling around the State of New Mexico as needed. She earns $20 per hour, but has no benefits such as health insurance and leave time and works all shifts, putting approximately 35,000 miles a year on her vehicle, which is now in a state of disrepair. She typically drives four hours (round trip) to Clovis to work a twelve-hour shift. In addition to the economic consequences of lost time and expenses of travel, Mary Gonzales suffers from loss of sleep, risk of motor vehicle crash injury and separation from her family.

178. Recently, Ms. Gonzales found lumps in her breast, which will have to be treated without benefit of health insurance.

## J.     Betty DeLosSantos

179. Betty DeLosSantos was a licensed practical nurse (LPN) in the Radiation Oncology Department from August of 1993 to May of 1995. She had worked as a nurse for ENMMC or its predecessor since 1966. When she began working in Radiation Oncology, Ms. DeLosSantos had no prior experience with radiation oncology, though she had worked with cancer patients during her many years of nursing.

180. Ms. DeLosSantos is a Hispanic woman.

181. Dr. Kapoor would only let Ms. DeLosSantos work with Spanish-speaking patients for whom she could translate. Dr. Kapoor made sure that Sally Netsch, rather than Ms. DeLosSantos, cared for certain "VIP" patients, saying they were not of Ms. DeLosSantos' "kind." These patients were White. Ms. DeLosSantos tried to avoid having contact with White patients in the Cancer Center because she did not want to get into trouble with Dr. Kapoor.

182. Dr. Kapoor regularly ignored Ms. DeLosSantos when she asked him a question.

183. Dr. Kapoor grabbed and pushed Ms. DeLosSantos many times. If Dr. Kapoor needed Ms. DeLosSantos for something he would come around the desk, grab her by the arm, and drag her where he wanted her.

184. Dr. Kapoor threw things like medical charts, records, and pencils over the nurse's station desk at Ms. DeLosSantos on an almost daily basis, and grabbed things out of her hands.

185. Dr. Kapoor frequently yelled at Ms. DeLosSantos and pointed his finger within a foot of her face

186. On one occasion, Dr. Kapoor threw a chart at Ms. DeLosSantos, hitting a cup of coffee and causing the coffee to spill on the floor and splatter on her arm and clothes. Dr. Kapoor never apologized. Mr. Sanchez and Ms. DeBaun saw the mess. Ms. DeBaun helped Ms. DeLosSantos clean it up. Ms. DeLosSantos complained to Wayne Stockburger about this incident.

187. Dr. Kapoor called Ms. DeLosSantos stupid many times – sometimes in front of patients and other staff members. This made her feel degraded and embarrassed.

188. Dr. Kapoor told Ms. DeLosSantos that she was a "stupid Mexican" and so were her family members.

189. Dr. Kapoor told Ms. DeLosSantos that she could attend staff meetings, but that she should not talk.

190. Dr. Kapoor said that Ms. DeLosSantos was not a "real" nurse and suggested that she should go work in a nursing home, saying: "This job is not for you. It's a high-tech job."

191. Dr. Kapoor told Ms. DeLosSantos that he was going to buy some land for a farm, go across the border and bring some Mexicans over to work cheap so that he could get rich. He pointed to Ms. DeLosSantos and said: "I'm sure you have some friends or relatives that would do that."

192. One day when Ms. DeLosSantos brought a chart in to Dr. Kapoor and corrected herself about which room a patient was in, Dr. Kapoor threw the chart down on the desk and yelled at Ms. DeLosSantos, "I'm going to have to fire you. You are so stupid. You can't

even remember where you put the patient. You're just like all the other Mexicans around here, lazy and stupid, always wanting to take siestas."

193. Ms. DeLosSantos observed that Dr. Kapoor spent less time with Hispanic patients and would say that he would only give certain Hispanic and African-Americans a little bit of treatment because in six months, and then he would make a thumbs-down motion

194. Dr. Kapoor ordered Ms. DeLosSantos to take care of menial non-nursing tasks. He told her to fill the copy machine with paper when he was standing in front of the machine, snapping his fingers at her and saying "go, go, go." Ms. DeBaun witnessed this. Dr. Kapoor also told Ms. DeLosSantos to clean the scuff marks off the nurse's station that he had put there by kicking the station. Dr. Kapoor did not assign these tasks to male employees. Ms. Netsch observed Dr. Kapoor instruct Ms. DeLosSantos to clean scuff marks off of the nurse's station.

195. Pat Sanchez, Sally Netsch and Phyllis DeBaun heard Dr. Kapoor refer to Ms. DeLosSantos as a "stupid, lazy Mexican." Dr. Kapoor also told Ms. Netsch and Ms. DeBaun that Ms. DeLosSantos lied and told stories.

196. Ms. Netsch and Ms. DeBaun observed Dr. Kapoor push Ms. DeLosSantos down the hall.

197. Patrick Sanchez saw Dr. Kapoor insult Ms. DeLosSantos on a daily basis, grab her by the arm and push or pull her down the hall. Mr. Sanchez also saw Dr. Kapoor exclude Ms. DeLosSantos from interacting with White patients.

198. Frank Sanchez heard Dr. Kapoor call Ms. DeLosSantos incompetent, stupid, fat, and slow.

199. In addition to the abuse and derogatory comments directed towards her, Ms.

DeLosSantos witnessed Dr. Kapoor abuse and degrade other women in Radiation Oncology. She saw Dr. Kapoor repeatedly get mad and yell at Phyllis DeBaun. She observed Dr. Kapoor ignore Ms. DeBaun's attempt to point something out about an x-ray, going instead to Richard Garcia – a male radiation tech with less experience and training. This was a pattern that Ms. DeLosSantos observed whereby Dr. Kapoor would go to the male employees rather than Ms. DeBaun. Ms. DeLosSantos heard Dr. Kapoor say that he could train a monkey to do Ms. DeBaun's job.

200. Ms. DeLosSantos also observed Dr. Kapoor degrade female patients. There was one breast cancer patient who had reconstructive surgery and the cancer reoccurred. Ms. DeLosSantos saw Dr. Kapoor take the drape covering her chest off when he was talking to her without doing any sort of examination requiring that her breasts be exposed. In Ms. DeLosSantos' presence Dr. Kapoor also popped this patient's nipples and told her she should be home pleasing her husband since she had the reconstructive surgery on her breasts instead of working in a furniture store. The patient appeared to be embarrassed and so was Ms. DeLosSantos. Ms. DeLosSantos never saw Dr. Kapoor similarly disrobe a male patient while he was talking to him nor did Ms. DeLosSantos ever hear Dr. Kapoor suggest to a male patient that he should be home pleasing his wife instead of working.

201. Ms. DeLosSantos met with Pam McArthur regarding Dr. Kapoor's abuse of her, specifically him spilling coffee on her by throwing a chart. Ms. DeLosSantos was crying and talked only about Dr. Kapoor's mistreatment – no other issues.

202. After Dr. Kapoor said that Ms. DeLosSantos was not a "real" nurse and that she should go work in a nursing home rather than the Cancer Center, Ms. DeLosSantos was up all

night crying, fearful about losing her job and being unable to support her family. The next morning Ms. DeLosSantos had chest pains and shortness of breath and she went to the emergency room. She had never experienced chest pains before. She told the emergency care physician that she had a confrontation with the doctor for whom she worked who was questioning her competency and making racial slurs. Her son's criminal proceedings had long since been concluded and were not a cause of her visit to the emergency room.

203. Wayne Stockburger told Ms. DeLosSantos that her job was being eliminated because Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO") standards required that Radiation Oncology have an RN, rather than an LPN. However, ENMMC filled Ms. DeLosSantos' position with another LPN.

204. Ms. DeLosSantos continues to suffer and live with the memories of the abuse and discrimination to which Dr. Kapoor subjected her. She continues to feel hurt and betrayed that Dr. Kapoor destroyed the career she built over 33 years.

205. After leaving Radiation Oncology, Ms. DeLosSantos worked in the Transitional Care Unit at ENMMC for approximately fourteen months at the same rate of pay she received in Radiation Oncology. This position required weekend hours and twelve-hour shifts. Then the hospital cut her hours to irregular, part-time hours. She left ENMMC and began working at Casa Maria – a nursing home where she received approximately one dollar more per hour, but no benefits.

206. Ms. DeLosSantos testified that she had never been treated the way Dr. Kapoor treated her in her entire career as a nurse. She had never been called names or degraded like Dr. Kapoor did. Ms. DeLosSantos testified that she will never recover from Dr. Kapoor's

constant abuse. She thinks about his harassment daily and still has nightmares about Dr. Kapoor. Her relationship with her family suffered because of Dr. Kapoor's abuse and she continues to doubt her abilities as a nurse because of Dr. Kapoor's frequent insults.

### III. CONCLUSIONS OF LAW

1.  Jurisdiction is proper under 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391 (b).

### A. Section 1983 Claims

#### 1. Under Color of State Law

2.  In order to state a § 1983 claim, the plaintiff must provide that the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941). The defendant's state authority may be either actual or apparent. *Jojola v. Chavez*, 55 F.3d 488, 493 (citing *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994)). The Supreme Court has held that state employment is generally sufficient to render the defendant a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935-36 n.18 (1982). The Court has also explicitly held that a physician with a contractual relationship with a public medical facility acts under color of state law for purposes of a § 1983 claim in the provision of medical care. *West*, 487 U.S. at 55-56. "It is the physician's function within the state system, not the precise terms of his [or her] employment, that determines whether his [or her] actions can fairly be attributed to the State." *Id*. at 56-57. Further, the Tenth Circuit has explained that acts committed by state employees are not done under color of state law if there is no connection between the state actor's authority and the violation allegedly committed by the defendant. *See Jojola*, 55 F.3d

at 493.

3.     Dr. Kapoor was not a public employee. He worked under a contractual agreement with a public entity, ENMMC, rather than as an employee.  Nonetheless, the Court finds that Dr. Kapoor had both actual and apparent state authority, as the physician in *West* did.  He was the Medical Director of ENMMC, directed Plaintiffs' work in Radiation Oncology and influenced decisions such as what staff positions the department should include.  Plaintiffs considered Dr. Kapoor their supervisor and acted in accordance with his direction.  The Court also concludes that the second requirement for acting under color of state law has been met in this case.  Dr. Kapoor was able to harass Plaintiffs because of his state authority as the Medical Director of a public radiation oncology department and because he supervised their work.  Accordingly, the Court finds that at all times material to this litigation, Defendant Dr. Kapoor acted under color of state law.

### 2. Racially and/or Sexually Hostile Work Environment in Violation of the Equal Protection Clause

4.     Sexual harassment in which the plaintiff suffers a hostile work environment based on sex is a form of sex discrimination which violates Title VII of the Civil Rights Act of 1964.  *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986).  Similarly, racial harassment which creates a hostile work environment is a form of race discrimination. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987).

5.     For sexual or racial hostile work environment harassment to be actionable it must be "sufficiently severe or pervasive to 'alter the conditions of the vicim's employment and create an abusive work environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)

(quoting *Meritor*, 477 U.S. at 67).  In making this assessment the trier of fact must examine all the circumstances including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the Plaintiffs'] work performance."  *Id.* at 23; *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998).  The victim of the harassment need not have suffered psychological harm, though that is a factor that can be considered.  *Harris*, 510 U.S. at 22-23.  Rather, it must be proven that the environment would reasonably be perceived and is perceived by the plaintiff as hostile or abusive.  *Id.* (citing *Meritor*, 477 U.S. at 67).  In other words, the plaintiff must prove that the work environment was both objectively and subjectively hostile.  *See Davis v. U.S. Postal Service*, 142 F.3d 1334, 1341 (10th Cir. 1998) (citing *Smith v. Norwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cr. 1997)).

6.     General harassment which is not based on race or sex is not actionable.  *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).  To state a hostile work environment claim, the conduct alleged must be based on the complainants' sex or race or be driven by racial or gender-based animus.  *Id.*  To state a sexually hostile work environment claim, the conduct alleged need not be of a sexual nature but must be based on the complainant's sex.  *See Hicks*, 833 F.2d at 1415.

7.     Sporadic racial slurs are insufficient to establish a racially hostile environment.  Rather, "there must be a steady barrage of opprobrious racial comments."  *Bolden*, 43 F.3d at 551 (citing *Hicks*, 833 F.2d at 1412-13).

8.     Plaintiffs may seek redress for hostile work environment harassment that violates the Equal

Protection Clause under § 1983.  *See Jemmott v. Coughlin*, 85 F.3d 61, 67 (2nd. Cir. 1996). The elements for a hostile work environment under the Equal Protection Clause are the same as those under Title VII.  *Id.*; *see also Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).

9.      Evidence of sexual or racial harassment directed at a plaintiff's co-worker is relevant to the plaintiff's harassment claim because it is evidence that the plaintiff's work environment was permeated with harassment.  *See Hirase-Doi v. U.S. West Communications,* Inc., 61 F.3d 777, 782 (10th Cir. 1995) ("evidence of a general work atmosphere, including evidence of harassment of other women, may be considered in evaluating a [sexual harassment] claim") (citing *Hicks*, 833 F.2d at 1415-16).  By the same reasoning, discriminatory treatment of Hispanic or women patients can contribute to a hostile work environment for Hispanic or women employees.  *See Rogers v. E.E.O.C.*, 454 F.2d 234, 238-39 (5th Cir. 1971) (racially discriminatory treatment of patients may give rise to Title VII claim by medical employee); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982).

10.     Courts, including the Tenth Circuit, have properly found that for a woman of color stating a hostile work environment claim, evidence of harassment based on race can be combined with harassment based on sex to satisfy the severe or pervasive requirement.  *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416-17 (10th Cir. 1987); *see also Jefferies v. Harris Co. Community Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980) (finding that "discrimination against black females [could] exist even in the absence of discrimination against black men or white women").  Accordingly, in assessing the hostile work environment claims of the Hispanic women Plaintiffs – Anna Nieto, Mary Gonzales, and Betty DeLosSantos, the Court

will consider evidence of harassment based on both Plaintiffs' race and their sex.

11.  Males do not have standing to bring a cause of action under § 1983 for offensive conduct aimed at females. *See Childress v. City of Richmond*, 134 F.3d 1205 (4th Cir. 1998) (Male police officers, while offended by the conduct of their supervisor toward Black, female officers, did not have standing to bring § 1983 claim because they were not an aggrieved party for whom the statute was enacted to protect). Similarly, Whites cannot base their § 1983 claim on offensive conduct aimed at Hispanics. Therefore, the Court will not consider Dr. Kapoor's mistreatment of female staff in assessing Patrick Sanchez' hostile environment claim and will not consider Dr. Kapoor's abuse toward Hispanic staff in assessing Sally Netsch and Phyllis DeBaun's hostile environment claims.

12.  Sally Netsch suffered a sexually hostile work environment created by Dr. Kapoor. He made numerous derogatory comments about women to her, including that women are whiny, useless, sensitive, and the "weaker sex." Dr. Kapoor told Ms. Netsch that women only marry men for money, that women's purpose is to serve men, that women should not work full-time outside the home, and that the only thing women are good for is first for love, then children, and then to care for you in your old age. Dr. Kapoor called Ms. Netsch overly sensitive and a whiny female on several occasions and told her she had abandoned her babies by working full-time. In addition Dr. Kapoor mistreated Ms. Netsch in several ways – grabbing things out of her hands, pushing her down the hall, and throwing patient charts and other things at her. The Court finds that this was conduct based on her sex because Dr. Kapoor did not do similar things to male employees – except that he did push Patrick Sanchez down the hall. In addition to experiencing Dr. Kapoor's derogatory comments about women and being

43

mistreated by him, Ms. Netsch also witnessed him mistreating other female employees and patients. He refused treatment to poor, female patients of color and ridiculed a patient by intentionally stimulating her breasts in front of Ms. Netsch and male employees. The combination of Dr. Kapoor's behavior which Ms. Netsch experienced and witnessed created a hostile environment based on gender in violation of the Equal Protection Clause.

13. Phyllis DeBaun suffered from a sexually hostile environment of Dr. Kapoor's making. Dr. Kapoor systematically excluded Ms. DeBaun from her work, ensuring that she would not gain familiarity with particular machines at ENMMC and then blaming her for this. Dr. Kapoor routinely preferred male employees over Ms. DeBaun despite her greater level of experience than the male employees. Dr. Kapoor repeatedly ignored Ms. DeBaun, communicating instead with the male employees. He made her feel invisible – as though she did not exist. Dr. Kapoor mistreated Ms. DeBaun in ways he did not similarly mistreat the male radiation therapist and tech. He yelled at her, grabbed her and pulled her down the hall, and threw patient charts at her. He made derogatory comments about women to her. In addition to the abuse she personally suffered under Dr. Kapoor's hand, Ms. DeBaun witnessed him cruelly mistreat other female staff and female patients. The Court has no trouble concluding that Dr. Kapoor's abuse of Ms. DeBaun affected the terms of her employment because he systematically prevented her from doing and learning her job – looking instead to male employees. Dr. Kapoor's conduct caused her emotional trauma and numerous physical manifestations, and created a hostile work environment.

14. The Court finds that Anna Nieto has not stated a hostile work environment claim. Ms. Nieto complained of the following unwanted sexual advances by Dr. Kapoor – that Dr. Kapoor

44

once asked her if she had a boyfriend and if she wanted him to walk her to her car; once touched her lower back for several seconds, moving his hand in a massaging fashion; and that a patient asked Ms. Nieto if she wanted to date Dr. Kapoor. Ms. Nieto stated at trial that she heard Dr. Kapoor make two racially hostile comments – that his staff was not yet back from lunch because they were on siestas and the comment "mañana, mañana, lazy Mexican." While the Court does find that these comments were racially offensive and that Dr. Kapoor's unwanted sexual attention toward Ms. Nieto has no place in a work environment, these few comments by Dr. Kapoor and touching her on the back once was not severe or pervasive enough to create a hostile work environment based on race and sex. Dr. Kapoor also made Ms. Nieto leave the simulation room where she had been called by Patrick Sanchez one day, yelling at her and telling her she was not needed. While the Court certainly does not condone this behavior it does not rise to the level of actionable workplace harassment.

15.  Patrick Sanchez suffered from a racially hostile environment caused by Dr. Kapoor. The evidence of Dr. Kapoor's racially-based harassment of Mr. Sanchez includes his suggestion that they hire "wetbacks" for two to three dollars an hour, calling Mr. Sanchez a "stupid, lazy Mexican," pushing Mr. Sanchez down the hall, yelling at Mr. Sanchez and pointing his finger in Mr. Sanchez' face, and Mr. Sanchez hearing Dr. Kapoor make racial slurs to and about other Hispanic staff, including Betty DeLosSantos, Frank Sanchez, and Mary Gonzales, each of whom Dr. Kapoor called a "stupid, lazy Mexican." Mr. Sanchez also witnessed Dr. Kapoor's extensive mistreatment of Hispanic staff members including daily yelling at and pulling on Ms. DeLosSantos and restricting Ms. DeLosSantos and Ms. Gonzales to working with Spanish-speaking patients. The Court finds that Dr. Kapoor's treatment of Mr. Sanchez

worsened when Mr. Sanchez complained about Dr. Kapoor's conduct. Though Defendant argues that Mr. Sanchez suffered only from stray racial remarks, the Court finds that the combination of the racial slurs and mistreatment directed at him and the racial harassment Mr. Sanchez witnessed other Hispanics suffer at Dr. Kapoor's hands was sufficiently pervasive that it created a racially hostile environment. The racial slurs are evidence that Dr. Kapoor's mistreatment of Mr. Sanchez and other Hispanic staff was based on racial animus.

16. Mary Gonzales was subjected to a hostile environment based on her ethnicity and gender because of Dr. Kapoor's conduct. Ms. Gonzales observed Dr. Kapoor telling a White patient that her daughter had "degraded" herself by marrying a Hispanic man and refusing to treat a Hispanic and African-American patient. Dr. Kapoor regularly yelled at her, and threw things at her including patient charts, and, on one occasion, a three-inch hardbound book which hit Ms. Gonzales. Ms. Gonzales was told by Dr. Kapoor that she was only to work with Spanish-speaking patients, but then told not to speak "that language," referring to Spanish. In Ms. Gonzales' presence Dr. Kapoor told a male patient that "women are penis envy." When the same male patient brought Ms. Gonzales flowers, Dr. Kapoor suggested he should have brought the flowers instead to a White staff member. The Court concludes that Dr. Kapoor's harassment of Ms. Gonzales was pervasive enough that it altered her working conditions and created a hostile environment.

17. The Court does not hesitate to conclude that Betty DeLosSantos was subjected to a racially and sexually hostile work environment created by Dr. Kapoor. Witnesses both for Plaintiffs and Defendant uniformly testified about what a competent, compassionate, skilled nurse Ms. DeLosSantos was and indeed she dedicated 33 years of her life to nursing at ENMMC and

its predecessor. Despite this wealth of experience, Dr. Kapoor belittled Ms. DeLosSantos in every way imaginable, focusing in particular on her ethnicity and gender. Dr. Kapoor made several derogatory comments about Ms. DeLosSantos' ethnicity, including calling her a "stupid, lazy Mexican" and noting that she must have some relatives in Mexico who would come to work for him for low wages. Dr. Kapoor repeatedly yelled at Ms. DeLosSantos, pointed his finger in her face, grabbed her and pulled her down the hall, threw patient charts at her, including one occasion during which the chart hit a cup of coffee which consequently spilled on Ms. DeLosSantos. Dr. Kapoor told Ms. DeLosSantos that she could not work with White, "VIP" patients because they were not "of her kind." Rather, her White co-worker Sally Netsch had to attend to these patients. Dr. Kapoor told Ms. DeLosSantos she was not a "real nurse" and that she should work in a nursing home, causing her extreme distress and prompting a visit to the emergency room. Adding to this already hostile environment was that Ms. DeLosSantos observed Dr. Kapoor mistreat female staff and patients in ways he did not treat male staff and patients. Further, Dr. Kapoor told Ms. DeLosSantos to complete menial tasks including washing scuff marks off the nurse's station. Ms. DeLosSantos suffered from a barrage of relentless, cruel abuse by Dr. Kapoor on a daily basis which was clearly pervasive conduct based on her ethnicity and gender which created a hostile work environment.

18.     There is no room for the gender and race-based harassment to which Dr. Kapoor subjected Plaintiffs in the workplace.

19.     Dr. Kapoor recognized the Plaintiffs' cherished values and exploited those values as weaknesses so that his discriminatory conduct would have the most debilitating effect on their

persons and their psyches.

20.     Given Dr. Kapoor's repeated discrimination towards women and Hispanics including plaintiffs, his misconduct can only be regarded as intentional, wilful and malicious.

21.     Dr. Kapoor may not excuse his public and overt discrimination against women and Hispanics by pointing to a "clash of cultures." There was no evidence submitted to support this theory advanced in opening statements.

### 3. Retaliation for Protected Speech in Violation of the First Amendment

22.     A public employer may not retaliate against an employee for exercising her or his constitutionally protected right to free speech. *Connick v. Myers*, 461 U.S. 138, 142 (1983).

23.     To prove retaliation in violation of the First Amendment, Plaintiffs must first prove that their speech was constitutionally protected. The speech is protected if it involves a matter of public concern; and the employee's interest commenting on matters of public concern outweigh the interests of the employer in promoting the efficiency of the public service it performs. Second, the Plaintiffs must prove that their speech was a substantial or motivating factor in the Defendant's decision to retaliate against the Plaintiffs. The Defendant can defend against this claim if he can prove that he would have reached the same decision in the absence of Plaintiffs' protected speech. *Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1201 (10th Cir. 1998) (citations omitted).

24.     In determining whether allegations of harassment constitute matters of public concern, the Tenth Circuit has drawn a line between a public employee's complaint that she or he was personally harassed and broader complaints either that co-workers are being harassed or that the harassment has interfered with the public agency's governmental responsibilities. *See*

*David v. City and County of Denver*, 101 F.3d 1344, 1356-57, *cert. denied*, 522 U.S. 858 (1997). The former are personal matters which are not protected by the First Amendment, whereas the latter involve public issues about which an employee has a constitutionally protected right to speak. *Id.*

25. The Tenth Circuit has implied a broad definition of First Amendment retaliation, rejecting the notion that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected rights are illegal. Actions short of an actual or constructive employment decision can in some circumstances violate the First Amendment." *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1437 n.3 (10th Cir. 1990).

26. Sally Netsch complained several times to Wayne Stockbruger and Susan Craig Fish about Dr. Kapoor's abusive behavior toward her and female patients and his conduct of her worsened after Ms. Netsch complained. On one occasion, Dr. Kapoor yelled at Ms. Netsch for complaining about patient care in Mr. Stockburger's presence. The Court finds Ms. Netsch's speech is a matter of public concern protected by the First Amendment because it dealt with the treatment of patients and accordingly whether the public hospital was providing appropriate patient care. Further, the Court finds that this conduct by Dr. Kapoor did constitute retaliation for Ms. Netsch exercising her First Amendment right to complain about harassing treatment. Dr. Kapoor has not argued that his mistreatment of Ms. Netsch was based on other grounds and therefore he is not entitled to a defense for retaliating against Ms. Netsch.

27. After Phyllis DeBaun complained about Dr. Kapoor's systematic mistreatment of her as compared to male employees to Wayne Stockburger and Susan Craig Fish, Dr. Kapoor

requested that Mr. Stockburger extend Ms. DeBaun's probationary employment period. The Court finds that Ms. DeBaun's complaints about discrimination were not protected speech because they addressed only her personal discrimination and not broader issues of public concern. On this basis the Court finds that Ms. DeBaun was not retaliated against in violation of the First Amendment.

28.     As to Anna Nieto's First Amendment retaliation claim, she alleges that after she rebuffed Dr. Kapoor's interest in her, his conduct toward her changed notably in that he criticized her work though he had not done so previously, grabbed x-rays from her, and when she came in to assist with a simulation, yelled at her, telling her to leave and that he did not need her. There is insufficient evidence before the Court to find that Ms. Nieto's rejection of Dr. Kapoor or any complaints she made dealt with anything other than her personal situation. Therefore, her speech is not protected and she was not retaliated against in violation of the Constitution.

29.     Patrick Sanchez repeatedly complained to Wayne Stockburger about Dr. Kapoor's harassment of himself and the female staff members in Radiation Oncology. Though Dr. Kapoor's discriminatory treatment of female staff was not relevant to his hostile work environment claim, it is relevant to his retaliation claim. Mr. Sanchez' complaints about Dr Kapoor's abuse of female staff were exactly the kind of speech recognized as protected speech in *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir. 1989) (complaining about sexual harassment of a co-worker is protected speech). When Mr. Sanchez complained about Dr. Kapoor's harassment, Dr. Kapoor routinely complained to Mr. Stockburger about Mr. Sanchez' work and urged Mr. Stockburger to terminate Mr. Sanchez. While the decision to

eliminate Mr. Sanchez' was the ultimately the hospital's – not Dr. Kapoor's, the Court finds that his complaints about Mr. Sanchez' performance and efforts to have him removed constituted retaliation for Mr. Sanchez' complaints that Dr. Kapoor was mistreating the staff.

30.     Mary Gonzales made a written complaint about Dr. Kapoor's derogatory comment to a patient in her presence that "women are penis envy."  When Dr. Kapoor discovered that Ms. Gonzales had complained about him to Mr. Stockburger, Dr. Kapoor retaliated against her by throwing her out of the room when she came to help with patients, throwing lab slips at her, telling her that he would no longer teach her, and telling her that he did not want her there.  As with Ms. DeBaun's claim, the Court concludes that Ms. Gonzales' complaint about Dr. Kapoor's comment which degraded women was not protected speech according to Tenth Circuit precedent because it was about her being personally offended rather than addressing a larger social issue.  Accordingly, Ms. Gonzales was not retaliated against in violation of her First Amendment rights.

31.     Although the Court found that Dr. Kapoor's treatment of Betty DeLosSantos was reprehensible and constituted actionable hostile environment harassment, it was not established at trial that Dr. Kapoor's treatment of her in worsened as a result of any protected speech by Ms. DeLosSantos.  Accordingly, the Court finds that Ms. DeLosSantos has not stated a claim for retaliation against Dr. Kapoor.

**B. Intentional Infliction of Emotional Distress**

32.     To state a claim for intentional infliction of emotional distress, a plaintiff must show that the Defendant engaged in extreme and outrageous conduct which was done recklessly or with the intent to cause severe emotional distress. *Andrews v. Stallings*, 119 N.M. 478, 491 (Ct.

App. 1995); see also UJI 13-1628 NMRA 1999. The conduct must be "so outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Dominguez v. Stone*, 97 N.M. 211, 214 (N.M. Ct. App. 1981); *see also Jaynes v. Strong-Thorne Mortuary, Inc.*, 124 N.M. 613, 618 (N.M. 1997); UJI 13-1628 NMRA 1999. To recover for emotional distress, the plaintiff must show that she or he suffered severe emotional damages such that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." *Jaynes*, 124 N.M. at 618 (quoting *Folz v. State*, 110 N.M. 457, 469 (1990)).

33.    As discussed, Dr. Kapoor's treatment of Sally Netsch including intentional derogatory statements about women in general and Ms. Netsch in particular and other mistreatment was outrageous and atrocious and caused Ms. Netsch severe emotional distress such that she prevails on her claim for intentional infliction of emotional distress. She lost weight, began drinking alcoholic beverages on a regular basis, had sleep problems, and experienced deteriorating relationships with her family.

34.    The Court finds that Dr. Kapoor intentionally inflicted emotional distress upon Phyllis DeBaun. She suffered extreme and outrageous abuse by Dr. Kapoor including completely ignoring her presence on a daily basis such that she felt invisible, grabbing her, pulling her, and throwing things at her. Dr. Kapoor's intentional cruel treatment of Ms. Netch caused her severe emotional distress including weight loss, loss of sleep, migraine headaches, and depression requiring medication.

35.    The Court concludes that Dr. Kapoor's treatment of Anna Nieto, while certainly

inappropriate, did not rise to the level of intentional infliction of emotional distress. Dr. Kapoor made two racially offensive comments which Ms. Nieto heard, touched Ms. Nieto's back in a massaging fashion for several seconds, asked to walk her to her car, had a patient ask if she wanted to date Dr. Kapoor, ordered Ms. Nieto to leave the simulation room where she had been called to assist, thereby humiliating Ms. Nieto, and criticized her work. This conduct was not so atrocious that a person would be unable to cope with the resulting emotional distress.

36.    Dr. Kapoor intentionally inflicted emotional distress on Patrick Sanchez by subjecting him to repeated racial slurs, calling him stupid and pointing his finger in Mr. Sanchez' face, dragging him down the hall, seeking to have Mr. Sanchez' position eliminated, and harshly criticizing Mr. Sanchez' work when Mr. Sanchez complained about Mr. Kapoor's abusive conduct. This extreme behavior caused Mr. Sanchez extreme emotional distress such that he sought counseling and medication for his depression and gained one-hundred pounds.

37.    Mary Gonzales suffered from emotional distress as a result of Dr. Kapoor's intentional abuse which included telling her she could only work with Spanish-speaking patients; telling her not to speak "that language," referring to Spanish, because now that she is in the United States she should speak English; subjecting her to derogatory comments about women and Hispanics; yelling at her; and throwing things, including a three-inch hardback book which hit her in the chest, at Ms. Gonzales. This outrageous conduct caused Ms. Gonzales emotional damage and constituted intentional infliction of emotional distress.

38.    The Court concludes that Dr. Kapoor's conduct toward Betty DeLosSantos was extreme and outrageous and was done with the intent to cause severe emotional distress. He repeatedly

called her stupid, subjected her to racial slurs, threw patient charts and other items at her, dragged her down the hall, told her not to associate with White "VIP" patients because they were "not of her kind," and ordered her to do non-medical tasks. The Court finds that Betty DeLosSantos suffered emotional distress because of Dr. Kapoor's relentless, cruel abuse. Accordingly, Ms. DeLosSantos prevails on her claim for intentional infliction of emotional distress.

### C. Qualified Immunity

39.  State actors are immune from civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, Dr. Kapoor is entitled to qualified immunity if it was not clearly established that his acts of harassment and retaliation violated constitutional law. In 1986 the United States Supreme Court recognized that hostile environment sexual harassment is a form of sex discrimination, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986), and in 1993 the Court adopted the current standard for determining whether a defendant's conduct created a hostile work environment. *Harris*, 510 U.S. 17; *Bolden*, 43 F.3d 545. In 1983 the Supreme Court held that a public employee cannot be retaliated against for exercising her or his constitutionally protected right of free speech. *Connick*, 461 U.S. at 146-47. The law was therefore clearly established at the time of the Dr. Kapoor's conduct toward Plaintiffs that creating a sexually or racially hostile environment and retaliating against a public employee for protected speech was against the law. Consequently, Dr. Kapoor is not entitled to the defense of qualified immunity.

**D. Damages**

40.     Defendant objects to Plaintiffs' introduction of damages evidence at trial, arguing that

they did not comply with Federal Rule of Civil Procedure 26(a)(1)(C) which requires

disclosure of damages calculations to Defendant.  The Court found at trial that general

testimony regarding damages was permissible on several bases.  First, significant damages

information was provided to Defendants, including Plaintiffs' tax returns – enough that the

ENMMC Defendants calculated Plaintiffs' damages for purposes of settlement

conferences which Dr. Kapoor's attorney attended.  Second, Defendant Kapoor deposed

Plaintiffs and failed to ask them questions related to damages.  Third, Defendant never

moved to compel the economic information he had not already received.  Fourth, some of

the relevant information, including Plaintiffs' salary levels at ENMMC was provided to

Defendant Kapoor by ENMMC.  Further, the Court ordered that certain of Mr. Sanchez'

tax returns be given to Defendant Kapoor during the trial and would have done the same

for Ms. Netsch except that Dr. Kapoor's counsel did not raise the issue of her returns until

the end of the last day of trial.  On these bases the Court finds that Plaintiffs' failure to

disclose their damages calculations did not prejudice Defendant, *Woodworker's Supply,*

*Inc. v. Principal Mut. Life*, 170 F.3d 985, 993 (10th Cir. 1999), and therefore it will deny

Defendant's request that the Court deny damages as a sanction for Plaintiffs' failure to

provide the calculations.

41.     Evidence of a settlement "is not admissible to prove liability for or invalidity of the claim

or its amount." Fed. R. Evid. 408. Moreover, the collateral source doctrine forbids

offsetting the damage award against Dr. Kapoor with the amount of settlements paid by

the other defendants. In general, the collateral source rule states, "Where a plaintiff is compensated for his injuries by some source independent of the tortfeasor–insurance, for example–the general rule is that the plaintiff is still permitted to make a full recovery against the tortfeasor himself, even though this gives the plaintiff a double recovery or even a recovery for losses he never had at all." *Quinones v. Pennsylvania General Insurance Co.*, 804 F.2d 1167, 1171 (10th Cir 1986) (quoting D. Dobbs, Handbook on the Law of Remedies § 8.10, at 581 (1973)). In this case there is no double recovery as Plaintiffs have not been compensated for the harm done by Dr. Kapoor. The prior settlement only addressed the harm and damages cause by those settling defendants. The Tenth Circuit has applied the collateral source doctrine in an employment discrimination case. *See EEOC v. Sandia Corp*. 639 F.2d 600 (10th Cir. 1980) (defendants not entitled to offset backpay award with unemployment benefits).

42. Section 1983 claimants are not entitled to double recovery. If a claimant states more than one claim for relief based on the same injuries, for example in this case where the Plaintiffs have stated both § 1983 and tort claims, the claimant is entitled to only one recovery for the injuries. *Quezada v. County of Bernalillo*, 944 F.2d 710 (10th Cir. 1991).

43. Damages may be awarded for non-pecuniary injury, such as psychological harm, where plaintiff has been deprived of his or her substantive constitutional rights. *Corriz v. Naranjo*, 667 F.2d 892 (10th Cir. 1981).

44. Plaintiffs Sally Netsch, Phyllis DeBaun, Patrick Sanchez, Mary Gonzales, and Betty DeLosSantos suffered damages as a result of Dr. Kapoor's conduct.

45. Dr. Kapoor's conduct as to Plaintiffs Betty DeLosSantos, Sally Netsch, Phyllis DeBaun,

Patrick Sanchez, and Mary Gonzales was intentional, malicious and willful, such that each

shall be awarded punitive damages against Dr. Kapoor. Dr. Kapoor repeatedly made

derogatory comments about women and Hispanics to Plaintiffs and in their presence;

belittled them personally and professionally; physically harassed them by throwing things

at them, grabbing Plaintiffs and pulling them down the hall; ridiculed their attempts to

raise concerns about Dr. Kapoor's behavior; and mistreated female and Hispanic patients

in Plaintiffs' presence. This systematic pattern of cruel behavior specifically aimed at

women and Hispanics can be seen as nothing but "motivated by evil motive or intent" and

illustrates Dr. Kapoor's "callous indifference to [Plaintiffs'] federally protected rights."

*Smith v. Wade*, 461 U.S. 30, 56 (1983).

### E. Relief[6]

Sally Netsch is hereby awarded $250,000 in compensatory damages and $250,000 in punitive

damages against Qudrat Kapoor, plus pre- and post-judgment interest and Plaintiff's reasonable costs

and expenses including attorneys' fees in amounts to be later determined.

Phyllis DeBaun is hereby awarded $375,000 in compensatory damages and $375,000 in

punitive damages against Qudrat Kapoor, plus pre- and post-judgment interest and Plaintiff's

reasonable costs and expenses including attorneys' fees in amounts to be later determined.

Patrick Sanchez is hereby awarded $500,000 in compensatory damages and $500,000 in

punitive damages against Qudrat Kapoor, plus pre- and post-judgment interest and Plaintiff's

---

[6]Plaintiffs' counsel in her closing argument urged the Court to order that any relief granted
in this case is not dischargeable in bankruptcy. However, Plaintiffs have not cited any legal
support for their assertion and did not state on what basis this relief should be granted.
Accordingly, the Court will not grant the remedy.

reasonable costs and expenses including attorneys' fees in amounts to be later determined.

Mary Gonzales  is hereby awarded $250,000 in compensatory damages and $250,000 in punitive damages against Qudrat Kapoor, plus pre- and post-judgment interest and Plaintiff's reasonable costs and expenses including attorneys' fees in amounts to be later determined.

Betty DeLosSantos is hereby awarded $500,000 in compensatory damages and $500,000 in punitive damages against Qudrat Kapoor, plus pre- and post-judgment interest and Plaintiff's reasonable costs and expenses including attorneys' fees in amounts to be later determined.

**DATED** this 17th day of March, 2000.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE


Counsel for Defendant Kapoor:
Mark D. Jarmie

Counsel for Plaintiffs DeBaun, DeLosSantos, and Nieto:
Randy K. Clark

Counsel for Plaintiffs Netsch, Sanchez and Gonzales:
Kathryn Hammel
Tandy Hunt